WILLIAM F. FOSTER, ETHEL FOSTER, LAURENCE SPEARS, GEORGE EVANS, JR., WALTER PARMAN AND MARGARET PARMAN, APPELLANTS, v. SILVE G. ARATA, RITA GIANELLI, EXECUTRIX OF THE ESTATE OF JOSEPH GIANELLI, DECEASED, DOMINIC L. BATTILANA, INDIVIDUALLY AND AS DIRECTORS AND TRUSTEES OF TAHOE ENTERPRISES, INCORPORATED, A CORPORATION, RESPONDENTS.

No. 4009

May 20, 1958.                                  325 P.2d 759.

*John E. Gabrielli,* of Reno, and *Hutchinson and Quattrin,* of San Francisco, California, for Appellants.

*Guild, Busey and Guild,* of Reno, and *Mazzera, Snyder and DeMartini,* of Stockton, California, for Respondents.

## OPINION

By the Court, BADT, C. J.:

Foster and Parman and others, appellants here, as plaintiffs below, sued Arata, Gianelli and Battilana, defendants below and respondents here, in a derivative action seeking a decree declaring void two deeds of trust and a chattel mortgage executed to the defendants by Tahoe Enterprises Incorporated whose stock was owned in part by the plaintiffs and in part by the defendants. By sale under the powers the defendants had bought in all of the mortgaged real and personal property and thereafter sold the same to third parties. For a period prior to the foreclosures, the defendants had also had themselves elected officers and directors and conducted the affairs of the corporation. Immediately following the foreclosures and possibly as part of the proceedings, the defendants also took possession of certain assets not embraced within the security instruments. The decree of the district court quieted title of the defendants and their successors in the properties purchased, and denied all relief to the plaintiffs by way of an accounting, dissolution, winding up or otherwise.

The issues before this court involve (1) the propriety of the decree quieting title in the defendants and their successors under appellants' contention that the deeds of trust and mortgages taken by the respondents were absolutely void as being without authority of any kind by reason of the fact that respondents were directors and officers of the corporation and because of lack of authorization by a majority of disinterested directors;

and (2) the court's refusal to order an accounting on any of the occasions of (a) the administration of the affairs of the corporation as a going concern under defendants' operation as officers and directors, (b) the disposition of the mortgaged real and personal property that had been bought in under the foreclosures and (c) the disposition by defendants of other assets of the corporation not embraced within the liens of their mortgages.

The real properties involved are on U. S. Highway 50 at Lake Tahoe and consist of contiguous parcels of land, partly east of the highway, on which are situate a hotel building, a casino, bar and restaurant building known as Tahoe Village, and a larger acreage known as the foothill property, and parcels west of the highway known as Sky Harbor and extending to the lake and known as the lake front property.

In the spring of 1949 plaintiff Parman, as agent for himself and his coplaintiffs Foster and Evans and for defendants Arata, Battilana and Gianelli and for one Marengo and Simms, purchased the Tahoe Village, lake front and foothill properties from Glen Meyers, the receiver of the former operators for $271,250, payable $121,250 down and $150,000 October 1, 1949, also assuming a balance of $37,660 on a former purchase contract. That spring, likewise as agent, he purchased from St. Claire Corporation the Sky Harbor property for $100,-000, payable $19,200 down, assuming the balance on what was known as the Rabe-Sky Harbor contract in the sum of $61,600, and the further sum of $19,200 payable June 1, 1950.

Tahoe Enterprises Incorporated held its organizational meetings June 30, 1949, and on July 1, 1949 Parman assigned the Meyers contract to the corporation. A month later, out of a special fund, Parman made a payment of $10,956 due on the Rabe-Sky Harbor contract. The following day the board of directors was advised by Parman, president, that $385,000 cash had been paid in to the treasury for the corporation's capital stock but that $30,000 more would be needed to carry on the company's business; that Battilana would lend this sum on chattel mortgage which was actually executed August

15, 1949 by Parman as president and Foster as secretary. On September 7, 1949 this action was ratified by the directors who were also advised by Parman as president that Arata, Battilana and Gianelli would loan $150,-000 to the corporation to pay the final installment on the Meyers contract due October 1, 1949. The directors authorized Parman and Foster as president and secretary, respectively, to issue the corporation's notes for this amount secured by deed of trust on all of the company's real property, and on the 28th of that month Arata, Battilana and Gianelli deposited $150,000 with Nevada Bank of Commerce at Reno for such final payment. The $150,000 notes and the deed of trust were executed and delivered October 1, 1949. The following month Parman assigned the St. Claire-Sky Harbor contract to the corporation.

On December 5, 1949 Arata and Battilana loaned $15,000 to the corporation by depositing that sum to its credit at the Hunter Square Branch of the Bank of America at Stockton, California, and later that month an audit was made by Semenza and Kottinger, certified public accountants, which showed an operating loss for the 1949 season of $122,550.18.

This condensed recital concludes the first season's operation, the season of 1949. We now come to the second period involved in the operation of the properties and the relationship of the parties, the 1950 season.

On December 14, 1949 a special meeting of stockholders was held, the capital stock issued and delivered to the sundry stockholders, and Arata, Battilana and Gianelli, Simms, Marengo, Foster and Parman were elected directors. At the directors' meeting that followed Arata was elected president, Battilana first vice president, Simms second vice president, Gianelli secretary, and Marengo treasurer. Except for Simms, the parties named acted, respectively, as such officers and directors thereafter.

The corporation at this point was confronted with necessary financing for the 1950 season, which ordinarily would commence in the month of May. The officers and

directors were particularly concerned with the approaching payments to become due on the Rabe and St. Claire contracts.

At about this time the Simms stock of 600 shares was purchased by one Chinchiollo and one Matteoni. These men, like Arata, Battilana and Gianelli, were from Stockton, California. The stock ownership then stood:

| | |
|---|---|
| Foster | 600 |
| Parman | 100 |
| Spears | 300 |
| Evans | 150 |
| Marengo | 200 |
| Chinchiollo and Matteoni (Simms stock) | 600 |
| Gianelli | 600 |
| Arata | 600 |
| Battilana | 600 |
| Total | 3,750 |

At about this period there seems no doubt but that Arata, Battilana and Gianelli now took over the complete management and operation of the corporation and its affairs. The corporate books and records were moved to Stockton. The relationship between the plaintiffs and the defendants became strained. Plaintiffs' group appeared to be in favor of an immediate sale of the properties. Defendants felt that they should carry on into the 1950 season and attempt to make a sale of the corporation and its properties as a going concern. Money was needed to meet the approaching land contract payments. Attempts were made to borrow the necessary funds from the First National Bank of Nevada at Reno and from the Stockton branch of the Bank of America. In these attempts defendants offered to subordinate their $150,-000 deed of trust to the end that a bank loan might be secured by a first lien. On May 2, 1950 a directors' meeting was attempted, but as only directors Arata, Gianelli and Foster attended, the meeting for lack of quorum was postponed to May 3. Foster, although he had signed a consent to the postponement, did not appear. Arata,

Gianelli, Battilana and Marengo were present, constituting a quorum. It appeared that Arata, Battilana and Gianelli had loaned to the corporation $22,500 and were willing to loan $100,000 more to carry on the business, and authorization was given for execution of the corporation's note and deed of trust to these three officers and directors in the sum of $123,025. Manifestly, out of the four directors present, three of them were the interested parties advancing the funds and receiving their secured notes. These were executed May 15, 1950 and the three payees deposited their cashier's check, payable to the corporation, in the Stockton bank. Out of this deposit there was paid on May 15 the $19,200 payment due June 1, 1950 on the St. Claire contract, paying the same in full.

On June 6, 1950 there was another meeting of directors. At this meeting directors Foster, Parman, Marengo, Spears, Gianelli, Arata and Battilana were present. A considerable part of the record is devoted to testimony as to what occurred at that meeting. The minutes show that at such meeting the minutes of the May 3, 1950 meeting were read and approved. There was no specific resolution ratifying, approving or confirming the action of the directors taken at their May 3 meeting. It is evident, however, that the affairs of the corporation, including the advance of funds to it by Arata, Battilana and Gianelli and the security taken by them were fully discussed. There seems no doubt but that all parties realized that the notes advanced by Arata, Battilana and Gianelli, secured as aforesaid, would fall due October 1, 1950 (the close of the 1950 season), and that the payees would expect payment of their money at that time. In the meantime, sundry payments had been made on the land contracts out of the funds advanced by Arata, Battilana and Gianelli. During the months of November and December of 1950 these three defendants deposited further sums in the respective amounts of $21,000, $12,000, $3,000 and $6,000 to the credit of the corporation at the Stockton bank to be checked out for the corporate operations. On December 19, 1950 a directors' meeting was

held at which Parman, Foster, Arata, Battilana, Gianelli and Marengo were present. At that meeting one Scofield, an accountant, presented a statement showing a substantial loss in the company's operations. All agreed that the property should be sold and Arata, Battilana and Gianelli expressed their willingness to defer foreclosure while all parties attempted to find a buyer. The meeting was adjourned to January 9, 1951 and a stockholders' meeting of December 19, 1950 was likewise adjourned to that date. In the meantime a payment of $6,360.10 was made on the Rabe foothill contract out of funds deposited by the three defendants. The January 9, 1951 meeting of the directors, adjourned to that day by consent from the December 19, 1950 meeting, was attended only by Arata, Battilana, Gianelli and Marengo. No buyer had been found. In February the three defendants gave notice of default and election to sell under their $123,025 trust deed. During May and June foreclosures were perfected and the properties bought in by the beneficiaries. In August, 1951 they in turn sold the Sky Harbor property for $100,000 and in April, 1952 sold the Tahoe Village, foothill and lake properties for $262,500.

(1) Appellants contend that the May 15, 1950 note and deed of trust in the sum of $123,025 were neither duly or regularly authorized nor subsequently ratified or confirmed and that they were void ab initio. The contention is without merit, as held by this court under similar circumstances in Federal Mining and Engineering Co. v. Pollak, 59 Nev. 145, 85 P.2d 1008. That case involved a mortgage foreclosure by the president of the appellant corporation. The note and mortgage had been executed, as the lower court found, without the full knowledge of all the directors. The loans made by the president had all been for the direct benefit of the corporation, and had been essential to its continued operation and preservation of its assets. Accepting appellant's contention that the note and mortgage authorized by less than a quorum were invalid under the bylaws of the corporation, the court held that the action taken by the directors was subsequently ratified by the corporation's

acceptance of the benefits thereof, i.e., by estoppel. "* * * [L]egal action was not and could not have been taken for lack of a quorum. Appellant's contention in these respects must be allowed. But generally speaking, it is a well-settled rule of law that one cannot accept the benefits derived from a transaction and repudiate any burden connected with it. To state the rule more specifically in its application to the facts of this case, a corporation cannot avail itself of the benefits of moneys loaned to it for its corporate purposes, and disavow a mortgage given without authority by its agents to secure the loan."

Under a similar fact situation in the case of Defanti v. Allen Clark Co., 45 Nev. 120, 127, 198 P. 549, 551, this court stated, "The evidence not being such as to convince us that the money borrowed upon its security was not applied with the knowledge and acquiescence of the corporation, we are of the opinion that to permit the company to shield itself under its corporate entity, * * * and now disaffirm the mortgage, when every opportunity for its mortgagee to obtain any other security is lost, would be unconscionable. Entertaining this view, we conclude to affirm the decree of foreclosure, even though the mortgage was unauthorized."

Appellants' contention that the mortgage and deeds of trust were void ab initio is based upon the proposition that an officer or director cannot deal personally with the corporation. This court, following the U. S. Supreme Court view, has held the rule to be otherwise. "Appellant contends that the respondent being an officer of the corporation takes the case out of the rule we have approved (that acceptance of the benefits by the corporation ratifies an invalid transaction by estoppel), and invalidates the transaction. This is not so. Such fact only subjects the evidence to a close scrutiny as to the good faith of the officer of a corporation who loans money to it and takes security therefor. That such a transaction is valid if fairly entered into, is settled law." Federal Mining and Engineering Co. v. Pollak, supra, citing

Hough v. Reserve Gold Mining Company, 55 Nev. 375, 35 P.2d 742, 745; Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328; and other cases. In Hough v. Reserve Gold Mining Company, supra, this court considered the validity of a contract by the corporation to purchase property from an officer of the corporation. We there said: "In such a case the better view, sustained by the weight of authority, is that a contract between a corporation and an officer thereof 'is not void per se, nor is it voidable, except for unfairness or fraud for which it will be closely scrutinized in equity.' " A comprehensive collection of authorities on this general subject is found in 31 A.L.R. 663, et seq.

Under the foregoing rules thus recognized by this court and appearing to be of well-nigh universal application, we must reject appellants' repeated contention that the $123,025 deed of trust and $30,000 chattel mortgage were void. In this respect the trial court found that the loans covered by the notes in question were essential to the business of the corporation and to the preservation of its assets and were made for the benefit of the corporation; that they were entirely used by the corporation in its corporate business and for payment of its obligations; that the corporation received and accepted the benefits of the loans; that the loans were openly made by the defendants in good faith and upon fair and reasonable terms without unfair advantage; that the corporate use was with full knowledge of the plaintiffs; that the loans constituted full cash value of the properties covered by the trust deeds and that when made, the corporation was solvent.

Appellants assert that this finding is not warranted by the evidence. Not only is the finding supported by substantial evidence but it is difficult to see how the court could have found otherwise. We are compelled to conclude that a good title passed to Arata, Battilana and Gianelli in their purchases under those proceedings and

that such part of the lower court's judgment quieting the title of the defendants and their successors in interest to the properties thus purchased must be affirmed.

(2) The next contention of appellants is that it was error for the court to refuse to order an accounting. This phase of the case has to do with the season of 1950 during which the defendants took over the administration of the business after their election as officers and directors at the stockholders' and directors' meetings of December 14, 1949. The court's denial of an accounting for this period was based upon the lack of the laying of a proper foundation. In this there was no error. The record is devoid of evidence showing any waste of assets, mismanagement, fraud or official misconduct during this period. Under such circumstances plaintiffs were not entitled to an interlocutory order for an accounting. In Benson v. Associated Art Press, Inc., 236 App.Div. 645, 260 N.Y.S. 282, 284, the court said: "On a record showing a complete absence of wrongdoing there can be no judgment for an accounting. The misconduct is not to be presumed. Indeed the law is to the contrary. 'The directors of a company still are the agents and trustees of a corporation, and have the control and management of its affairs for the benefit of the stockholders and the reasonable service of the public, and until it is shown otherwise there is a presumption that their acts were honest and in the best interests of the company,'" (quoting opinion in Matter of Watertown Gas Light Co., 127 App.Div. 462, 466, 111 N.Y.S. 486, and citing other cases). In Bell v. Frank Gilbert Paper Co., 117 Misc.Rep. 610, 193 N.Y.S. 26, 29, the court said: "A stockholder of a corporation has no absolute right to compel an accounting to him by the corporation or its officers. An accounting, however, may be decreed, upon proof of official misconduct; but the burden of proof resting upon the stockholder is only met when he established that waste and misconduct, or misappropriation of funds, has actually been committed by the defendants." See also Scolnick v. Sun Specialties, 104 N.Y.S.2d 21; 19 C.J.S. 251, Corporations, sec. 833.

(3) The refusal of the court to order an accounting of the proceeds of sales of the properties made by the defendants after their foreclosures is appellants' next assignment of error. Here we are concerned with the personal dealings of the defendants, as fiduciaries, with assets of the corporation. The general rule relied upon in this assignment is that stated in 3 Fletcher, Cyclopedia of Corporations (Perm.Ed.), sec. 884: "Directors and other officers of a private corporation cannot either directly or indirectly, in their dealings on behalf of the corporation with others, or in any other transaction in which they are under a duty to guard the interests of the corporation, make any profit for themselves, or acquire any other personal benefit or advantage, even though such officer or director may own practically all of the stock of the corporation, and if they do so, they may be compelled to account therefor to the corporation in an appropriate action." Often quoted is the language of Mr. Justice Douglas speaking for the United States Supreme Court in Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281: "A director is a fiduciary. * * * So is a dominant or controlling stockholder or group of stockholders. * * * Their powers are powers in trust. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. * * * The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside." See the application of this principle in Lebold v. Inland Steel Co., 7 Cir., 125 F.2d 369, where emphasis is laid upon a sale of the property for an inadequate consideration. The court likewise applied this principle in Austrian v. Williams, D.C., 103 F.Supp. 64, in which certain transactions of which complaint was made were approved, while other transactions were set aside and rescission

adjudged. See also Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 84 U.S.App. D.C. 275, 173 F.2d 416.

Although from the tabulation, supra, it would appear that the defendants did not hold a majority of the stock (although plaintiffs contend that they likewise controlled the 600 Simms shares which would give them a majority), they were still in such dominant position as to subject them to the rule stated. Although as seen from Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328, and other cases cited supra, the defendants had the right to bid the property in to protect their security, they were still charged with their obligations as fiduciaries. Their purchases must have been in the best interests of the corporation consistent with their rights to realize on their security. Hallam v. Indianola Hotel Co., 56 Iowa 178, 9 N.W. 111. Their activities must be subject to close scrutiny to ascertain whether the foreclosure purchases and subsequent resale of the corporate properties were completely fair to the corporation. An important criterion is whether or not an adequate price was paid for the property. Union Ice Co. of Philadelphia v. Hulton, 291 Pa. 416, 140 A. 514. We need not multiply the authorities. They are of similar purport and decided upon the facts of each individual case.

The findings of the district court that the sale by the defendants of the properties bought in at foreclosure ($125,000, subject to the deed of trust for $150,000, and $15,000 for the chattel mortgaged property bought in) constituted the full cash value of said real and personal properties is substantially supported by the evidence. No other purchaser could be found and no other bids were made, although other persons attended the sale. The aggregate of their receipts on resale (sale to Salette for $262,500 and the sale to Fisher for $65,000 less a broker's commission of $23,000 and plus a $40,000 appraised value of properties retained) made their total

recovery $344,500. Their advances to the corporation exceeded this sum according to testimony to which the district court was entitled to give credence by over $70,000. This in turn was subject to minor credits and charges not substantially affecting the situation. The testimony of the defendants, the bank accounts offered in support, the books of the corporation deposited in court for the inspection of the plaintiffs and the exhibits of the accountants furnished ample substantiation of the court's findings and conclusions in this respect. On this item then the court was likewise justified in denying interlocutory judgment for an accounting. Under these circumstances "[a]n accounting would be no more than an empty ceremony." Scolnick v. Sun Specialties, 104 N.Y.S.2d 21, 23.

(4) Appellants further assign as error the court's refusal to order an accounting of assets taken over by the defendants which were not included in their securities. These assets are referred to by appellants as items of cash in hand, cash in bank, accounts receivable, licenses, deposits as security for taxes, deposits on utility services, union contracts for entertainers and prepaid insurance. While it is true that the defendants have accounted for an item of $489.75 as a refund from the Nevada Industrial Insurance Commission and likewise for a refund of $1,160.60 from Sierra Pacific Power Company and a refund of $4,500 on the deposit for entertainment, and $368.80 apparently on account of partial prepaid insurance of $5,345, appellants were foreclosed by orders of the court in the sustaining of objections to questions on cross examination from making inquiry not only into these items but into an item of inventory of liquors in the sum of $2,922.53, and an item of cash on hand and in bank of $15,370.45, which items appeared in the balance sheet of September 30, 1950. Objections were sustained to all questions on cross examination attempting to elicit information as to what had become of these items, upon the ground that such

inquiries went into the subject of accounting, for which a proper foundation had not been laid. We have heretofore held in this opinion that an accounting was properly refused for the period in which the defendants were in active control because there had been no showing of waste, mismanagement or fraud in the conduct of the business as a going concern. We have also held that an accounting was properly refused of the proceeds of sales of property bought in on foreclosure because of lack of showing of any unfairness, inadequacy of price or other facts to throw doubt upon the fact that the defendants had suffered a substantial loss in the transactions. We have here, however, a different situation. At the close of the 1950 season substantial assets were in the hands of the defendants which they took over and disposed of arbitrarily. They had no lien upon these assets. The authorities justifying foreclosure of their mortgages under the conditions described have no bearing upon their seizure and disposition of these assets. An accounting must be had of such disposition.

(5) Appellants assign error in the court's refusal to enter a decree dissolving the corporation, which relief, among others, was sought by the prayer of their complaint. The answer of defendants asserting the propriety of their loans to the corporation and of the trust deeds and chattel mortgage securing same, as well as of the realization upon the said securities and the use of the loaned funds for the purposes of the corporation, would indicate their agreement with plaintiffs' allegation that the corporation was without assets of any kind. In any event the evidence conclusively shows and the court specifically found that substantially all of the real and personal property of the corporation had been sold under the trust deeds and chattel mortgages so that the corporation was indeed substantially without property or assets of any kind as alleged by plaintiffs. We can conceive of no clearer example of a corporation which "has abandoned its business," which situation under the provisions of NRS 78.650 authorizes a decree dissolving the corporation.

If the limited new trial hereby ordered, and such judgment and orders as may be made by the trial court as a result thereof, indicate that a dissolution of the corporation is called for under the statute, it may be that under the facts and circumstances developed, further consideration will be given to this item by that court.

The case must be remanded to the district court for a new trial limited to an accounting by the defendants of the assets thus taken over by them which were not included in their deeds of trust or chattel mortgage. Such limitation, however, is without prejudice to the right of the court to order a further accounting either of the 1950 operation by respondents or of the sale of assets taken over by foreclosure if the accounting of the unpledged assets taken over and disposed of should throw such doubt upon the fairness and good faith of respondents as to indicate the propriety of such more extensive accounting; and without prejudice to the right of the court to consider and determine the question of dissolution.

Subject to the last preceding paragraph the judgment quieting title in respondents and their successors is affirmed; the denial of an accounting to appellants for the 1950 operation of the business and for the proceeds of sale of the foreclosed properties is affirmed; the denial of an accounting for the disposition of assets not included in the mortgages is reversed and the cause remanded for a limited new trial of this item. Each party will pay his and their own costs on this appeal.

EATHER and MERRILL, JJ., concur.