Filed 12/22/16

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| INTEGRATED DYNAMIC SOLUTIONS, INC., et al., | B268311 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. LC103281) |
| v. | |
| VITAVET LABS, INC., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Frank J. Johnson, Judge.  Affirmed.

Westlake Legal Services, Paul S. Zimmerman for Plaintiffs and Appellants.

Buchalter Nemer, Oren Bitan for Defendant and Respondent.

\* \* \* \* \* \*

A company hired a computer software consultant to create custom-built software, and the consultant delivered an unfinished version of the software and withheld the source code and technical specifications needed to finish it.  The parties sued each other.  The trial court issued a preliminary injunction that, among other things, ordered the software consultant to deliver the source code and technical specifications to the company.  Does a preliminary injunction that alters the status quo constitute an impermissible final adjudication of the merits of the lawsuit?  We conclude it does not, although such injunctions are reserved for "extreme cases" where the right to relief is "clearly established." (*City of Corona v. AMG Outdoor Advertising, Inc.* (2016) 244 Cal.App.4th 291, 299 (*City of Corona*).)  Because this is one of those "extreme cases," we affirm the issuance of the injunction.

**FACTS AND PROCEDURAL HISTORY**

## I.     Facts

Defendant and cross-complainant VitaVet Labs, Inc. (VitaVet) is in the business of manufacturing and selling dietary supplements for pets.  VitaVet sells its products using the name NuVet Labs, and most of its sales are over the phone or internet.  By 2013, the computer system VitaVet used to run its business as well as its internet website was "antiquated" and "extremely slow."  In late 2014 and early 2015, VitaVet hired plaintiff and cross-defendant Integrated Dynamic Solutions, Inc. (IDS) to "develop an entirely new and more efficient" software program for VitaVet that would increase the speed and efficiency of its online ordering, billing, payments, shipments and customer support.

To implement this arrangement, VitaVet and IDS signed two documents:  (1) a consulting agreement setting forth the

2

general terms of the parties' relationship; and (2) a statement of work specifically governing the software upgrade project.

In the consulting agreement, IDS promised to provide "technical consult[ing]" services to VitaVet as an independent contractor. Because those services were to be "specially ordered or commissioned by VitaVet," any software or other projects developed by IDS for VitaVet were to be "considered a work made for hire." IDS accordingly "agree[d]" that all of its "[w]ork, inventions, improvements, ideas, discoveries, trade secrets, trademarks, service marks, designs, processes, methods, products, software codes, works of authorship, compilations, collective works, derivative works, and reports made" were "VitaVet's sole and exclusive property" and, consistent with this agreement, "assign[ed]" its "right, title and interest" to those outputs to VitaVet. IDS also agreed to "protect and safeguard" any "confidential information" VitaVet provided and to "promptly return" all VitaVet "data, materials and other property . . . , *including . . . all work/materials/artwork . . . created by IDS*" if either party terminated the agreement.

In the statement of work, VitaVet hired IDS to create a new software "application, database, and [source] code" for VitaVet's business to serve as (1) a customer interface for online purchases and account management, and (2) an employee interface to manage customer and distributor records, inventory and accounting. Because VitaVet's existing computer system was sorely outdated, VitaVet hired IDS to provide the upgraded system in 20 weeks, and the parties agreed upon a staged delivery and payment schedule: (1) VitaVet would pay $30,000 on or before January 15, 2015 (the date the contracts were signed); (2) VitaVet would pay $30,000 upon the "delivery . . . and

acceptance" of a "Technical Design Document," which IDS was to produce by February 20, 2015; (3) VitaVet would pay $30,000 on March 15, 2015; and (4) VitaVet would pay $80,000 upon the "delivery and acceptance of the completed application," which IDS was to produce by June 5, 2015. To emphasize that time was of the essence, VitaVet agreed to pay bonuses for early delivery, and IDS agreed to suffer monetary penalties for late delivery. IDS also agreed to deliver "[t]he application, database, and [source] code . . . to VitaVet anytime during the project" upon written request.

The parties' performance did not go as planned. VitaVet made a timely payment of $30,000 in January 2015, but IDS did not deliver a Technical Design Document by February 20, 2015, or by March 15, 2015. VitaVet consequently withheld both the February and March payments. IDS delivered an "incomplete" version of the Technical Design Document that it acknowledged was still a "work in progress" on March 20, 2015; VitaVet thereafter paid the February and March installments and gave IDS feedback on the "rough" draft. IDS eventually delivered a copy of the software itself on August 14, 2015, two and a half months after the June 5, 2015 deadline. The parties dispute whether the software was "finished," but do not appear to dispute that IDS refused to deliver the source code for the software, refused to return any of the confidential and proprietary information VitaVet let IDS use in developing the software, and never provided a final Technical Design Document. VitaVet did not make the final payment under the contract.

## II.    Procedural History

Three days after delivering the software, IDS sued VitaVet for (1) breach of contract, (2) reasonable value for services

4

rendered, (3) conversion, (4) injunctive relief, and (5) declaratory relief. VitaVet cross-claimed against IDS for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) unjust enrichment, (4) fraud, and (5) declaratory relief. In its cross-complaint, VitaVet sought damages, declaratory relief, and a permanent injunction ordering IDS to "immediately deliver" the software's "current source code" and current Technical Design Document, to "immediately return" all of VitaVet's "confidential . . . information," and to "refrain from disclosing" or "making improper use" of any of VitaVet's confidential information.

A week after filing its cross-complaint, VitaVet sought a preliminary injunction. The trial court granted VitaVet's request, and preliminarily enjoined IDS from (1) "continuing to withhold from VitaVet the most current application, database, migration scripts, source code, and Technical Design Document for the software developed by IDS for VitaVet under the parties' . . . contract"; and (2) "disclosing to third parties or otherwise making improper use of confidential VitaVet information in their possession." The injunction would not take effect until VitaVet posted a $73,750 bond, which was the remaining balance VitaVet owed under the contract (that is, the $80,000 final payment less the late delivery penalties).

In issuing the injunction, the court found that VitaVet was likely to prevail in its breach-of-contract cross-claim because IDS refused to deliver the most current source code and Technical Design Document, despite the fact that they "do[] not belong to [IDS]" under the parties' contracts. The court further found that the balance of interim harms favored VitaVet. Specifically, the court reasoned that VitaVet had made a "persuasive showing"—

5

through the sworn declaration of its chief operating officer—that the failure to turn over the up-to-date source code and Technical Design Document would cause VitaVet "great harm" because the software IDS delivered could not be used without the source code and because, in the meantime, VitaVet's old software was getting slower and causing more and more problems. Conversely, the court reasoned that IDS would suffer "no harm whatsoever" from delivering the source code because it was of "no use" to IDS and because the bond obviated any danger of monetary loss. The court acknowledged that IDS's loss of exclusive possession of the source code might cause a "loss of . . . negotiating position," but found such harm to be legally irrelevant.

VitaVet posted the required bond, and IDS filed this timely appeal.

## DISCUSSION

IDS challenges the trial court's issuance of the preliminary injunction on two grounds: (1) it is not supported by substantial evidence under the traditional standards for issuing such injunctions; and (2) it amounts to a "de facto permanent injunction" because it changes the status quo and largely mirrors the terms of the permanent injunction VitaVet seeks in its cross-complaint. We conclude that both arguments lack merit.

## I. Substantial Evidence Supports the Issuance of the Preliminary Injunction

A trial court may grant a preliminary injunction upon a showing that (1) the party seeking the injunction is likely to prevail on the merits at trial, and (2) the "interim harm" to that party if an injunction is denied is greater than "the [interim] harm the [opposing party] is likely to suffer if the . . . injunction is issued." (*SB Liberty, LLC v. Isla Verde Assn., Inc.* (2013) 217 Cal.App.4th 272, 280 (*SB Liberty*); Code Civ. Proc., § 527,

6

subd. (a).)  These two showings operate on a sliding scale:  "[T]he more likely it is that [the party seeking the injunction] will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue."  (*King v. Meese* (1987) 43 Cal.3d 1217, 1227 (*King*).)

Although preliminary injunctions are generally designed to "'preserve the status quo pending a determination on the merits of the action'" (*Law School Admission Council, Inc. v. State of California* (2014) 222 Cal.App.4th 1265, 1280), they are not so limited.  A court also has the power to issue a preliminary injunction that ""'mandates an affirmative act that changes the status quo'"" (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1047-1048), but should do so only in those "extreme cases where the right thereto is clearly established."  (*City of Corona*, *supra*, 244 Cal.App.4th at p. 299.)  We ordinarily review a trial court's issuance of a preliminary injunction for an abuse of discretion (*SB Liberty*, *supra*, 217 Cal.App.4th at pp. 280-281), but "more closely" "scrutinize" injunctions that "change[] the status quo" (*Oiye*, at pp. 1047-1048).  In assessing the trial court's factual findings underlying a preliminary injunction, we apply the substantial evidence standard and view the evidence in the light most favorable to the court's ruling.  (*City of Corona*, at pp. 298-299.)

Although the status quo for these purposes can be easily defined as """the last actual peaceable, uncontested status which preceded the pending controversy"""" (*14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1408), determining whether a particular order alters the status quo can be more difficult.  (See, e.g., Code Civ. Proc., § 916 [automatic stay pending appeal turns on whether injunctive

7

order to be reviewed alters the status quo]; *Kettenhofen v. Superior Court* (1961) 55 Cal.2d 189, 191 [so noting].) The injunction in this case alters the status quo insofar as it requires IDS to hand over the source code and other related documents to VitaVet.

The trial court did not abuse it discretion in concluding that this is one of those "extreme cases" where VitaVet had a "clearly established" right to preliminary injunctive relief. To begin, VitaVet "clearly established" that it is likely to prevail on the merits of its breach-of-contract claim. To prevail on its claim, VitaVet must show (1) it had a contract with IDS, (2) VitaVet performed its contractual obligations or had a valid excuse for not doing so, (3) IDS breached the contract, and (4) VitaVet was consequently damaged. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) It is undisputed that VitaVet and IDS had a contract. More to the point, VitaVet established that the contract gave all ownership of IDS's work product to VitaVet, going so far as to empower VitaVet to obtain copies of that product whenever it wanted. IDS's refusal to hand over the source code breached these contractual provisions and damaged VitaVet's business operations. IDS responds that VitaVet cannot establish a likelihood of prevailing because VitaVet did not make all four contract payments even though IDS eventually delivered both the Technical Design Document and software; thus, IDS reasons, VitaVet did not perform its contractual obligations. IDS's argument overlooks that VitaVet's duty to pay was conditioned upon not only the "*delivery*" of the Technical Design Document and software, but also its "*acceptance.*" The Technical Design Document was admittedly a "work in progress," and VitaVet attested—without contradiction—that the software was

8

inoperable without the source code IDS refused to provide. VitaVet never "accepted" these deliveries, and thus was not yet obligated to make the final payment.

Further, the trial court did not err in concluding that the balance of interim harms "clearly established" VitaVet's entitlement to a preliminary injunction directing IDS to hand over the source code and Technical Design Document. Denying that injunctive relief would leave VitaVet unable to make use of the software IDS delivered in August 2015, forcing VitaVet to continue using its outdated and slow software, which was already causing "extreme employee inefficiency" and "significant business losses," and was stymieing VitaVet's plans to expand its business. At the same time, granting that injunctive relief would cause IDS no harm because it was customized software IDS had developed for a specific customer and for which IDS itself had no use. Although IDS's counsel for the first time at the hearing suggested that IDS could "tweak[]" the software and sell it "to somebody else," IDS submitted no evidence to support this suggestion. Further, requiring VitaVet to post a bond to cover any damages IDS might be owed under the contract further protected IDS against any monetary harm. To be sure, this injunction undeniably causes IDS to suffer some loss of bargaining position by precluding it from negotiating a larger settlement while holding the source code hostage. But, as the trial court properly noted, loss of negotiating position is a not a cognizable harm for these purposes.

IDS asserts that this analysis is faulty because VitaVet's cross-complaint was not verified. This assertion lacks merit because a preliminary injunction must rest on *either* a verified pleading *or* "facts shown by affidavit." (Code Civ. Proc., § 527,

9

subd. (c)(1).)  Here, VitaVet's chief operating officer submitted a sworn affidavit.  This suffices.  IDS contends that the chief operating officer's affidavit was "conclusory," but it was not:  The officer spelled out specific instances of system slowdowns, customer complaints and loss of business due to VitaVet's inability to use the software it had commissioned from IDS.  The cases IDS cites in support of its argument are distinguishable on their facts.  (Cf. *Levy v. City of Santa Monica* (2004) 114 Cal.App.4th 1252, 1257, 1259 [realtor's declaration as to "adverse effect on the marketability of [the] home" conclusory and inadequate to show damage]; *Jewish Defense Organization, Inc. v. Superior Court* (1999) 72 Cal.App.4th 1045, 1055-1056 ["conclusory and vague statements" insufficient proof of minimum contacts to establish personal jurisdiction].)

## II.    The Injunction is not a Final Adjudication on the Merits

For decades now, our Supreme Court has consistently reaffirmed that "'[t]he granting or denial of a preliminary injunction does not amount to an adjudication of the ultimate rights in controversy.'"  (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528; *King, supra*, 43 Cal.3d at p. 1227; *Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.)  IDS nevertheless asserts that the preliminary injunction issued in this case *does* amount to a "de facto permanent injunction," and offers three arguments in support of that assertion.

First, IDS notes that the preliminary injunction in this case to some extent alters the status quo.  This is true, and we have accordingly applied the greater appellate scrutiny demanded by the case law governing such preliminary injunctions.  However, that case law necessarily rejects IDS's contention that any

10

preliminary injunction that alters the status quo constitutes an impermissible permanent injunction.

Second, IDS observes that the relief afforded by the trial court's preliminary injunction largely mirrors the permanent injunctive relief VitaVet seeks. This is hardly surprising, as ""'[t]he scope of available preliminary relief is necessarily limited by the scope of the relief likely to be obtained at trial on the merits. [Citations.]'"" (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463.) The resulting overlap provides no cause for declaring a preliminary injunction invalid.

Lastly, IDS decries that the trial court's preliminary injunction renders any subsequent trial a fait accompli, thereby denying IDS its due process rights by denying it a trial on the merits. We disagree. The preliminary injunction issued in this case does not deny IDS its right to trial for the simple reason that the injunction rests solely on the facts presented to the trial court at the time of its issuance; IDS's right to trial remains intact because "[a] full hearing at trial is still required to adjudicate the ultimate rights in controversy." (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 75-76.) IDS cites *Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999, but the court in that case entered *judgment* following issuance of a preliminary injunction. The trial court in this case did no such thing.

11

## DISPOSITION

The order is affirmed.  VitaVet is entitled to its costs on appeal.

**<u>CERTIFIED FOR PUBLICATION.</u>**


_____, J.

HOFFSTADT

We concur:

_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ


12