Filed 6/29/21  Sweegen v. Chen CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ODG SWEEGEN et al.,<br><br>　　Plaintiffs and Respondents,<br><br>　　　　v.<br><br>STEVEN CHEN et al.,<br><br>　　Defendants and Appellants. | G059226<br><br>(Super. Ct. No. 30-2020-01140383)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Glenda Sanders, Judge.  Affirmed.

Greenberg Traurig, Gregory A. Nylen, Karin L. Bohmholdt, Alex Linhardt and Breeanna N. Brewer for Defendants and Appellants Steven Chen, Min Wang Chen, Lucas Wenthe, The Chen Family Living Trust, Conagen, Inc., Phyto Tech Corp., Bug Venture LLC, ProTab Laboratories, Anhui Longking Biotechnology Co., Ltd.

Meylan Davitt Jain Arevian & Kim, Raymond B. Kim and Shaunt T. Arevian for Defendant and Appellant SweeGen, Inc.

Hueston Hennigan, Alison L. Plessman, David B. Sarfati, Eunice Leong and Salvatore Bonaccorso for Plaintiffs and Respondents ODG SweeGen LLC, Harold Handelsman Revocable Trust, Marstar Investments LLC, John M. Pigott, John D. Howard, Barbra Womble, Christopher Bancroft, SweeGen Investment Fund, LLC, SHG Planning Inc., 401k Evergreen Life in Respect of Its Segregated Account 191, and the Hugh Bancroft Jr. Trust U/W Article Third.

\*          \*          \*

Plaintiffs invested $18.8 million in SweeGen, Inc. (SweeGen), which is owned and controlled by defendants Steven and Min Chen (the Chens; collectively the defendants).[1] The Chens also own several other entities that supply services and products to SweeGen. Plaintiffs became aware of several unexplained monetary transfers made by SweeGen to the Chens and their other entities. They concluded the Chens were engaged in self-dealing, so they brought this lawsuit and filed a motion for a preliminary injunction, which the trial court granted. The injunction requires SweeGen to give plaintiffs five days' notice before transferring funds or assets to the Chens or Chen-owned entities or entering any agreements with them. Transactions made within the course of SweeGen's daily business are excluded from this requirement. The court also ordered plaintiffs to post a $210,000 bond.

Defendants appeal the court's order. First, they argue the court erred in finding that plaintiffs were likely to succeed on the merits. This finding was based on the court's determination that there were numerous transactions involving SweeGen that were not fair or in the company's best interests. There is substantial evidence supporting this finding. Among other things, the record shows that (1) the Chens caused SweeGen

---

[1] Because the Chens share the same last name, we refer to Steven and Min by their first names to avoid confusion.

2

to make a substantial interest-free loan to their family trust, which was repaid by another Chen-owned entity; (2) the Chens altered SweeGen's financial statements; (3) the Chens purchased a manufacturing facility with a shell company, grossly misrepresented the purchase price, then recommended that SweeGen buy the facility at that price; and (4) SweeGen made numerous unexplained monetary transfers to Chen-owned entities.

Next, defendants argue plaintiffs will not suffer any irreparable harm without the injunction and, consequently, the balance of harms tilts in their favor. We disagree. There are already significant sums of money that are unaccounted for and have not been traced. Thus, there exists a reasonable probability that without the injunction the Chens will transfer additional sums of money to themselves or their entities that will be untraceable even after an accounting. Further, there appears to be a legitimate concern that any damages caused by a devaluation in plaintiffs' shares due to the Chen's self-dealing will be difficult to ascertain. In contrast, defendants have failed to provide any evidence that the injunction will interfere with SweeGen's business.

Finally, defendants argue the injunction is impermissibly vague and the amount of the bond is too low. Not so. The language of the injunction sufficiently articulates defendants' duties. As for the bond, the court was unpersuaded by defendants' evidence of potential business loss and attorney fees. It acted within its discretion by ignoring this evidence and setting the amount of the bond based on its own reasonable calculation of potential attorney fees.

For these reasons, we affirm the trial court's order.

I

FACTS

A. *SweeGen and Affiliated Entities*

SweeGen is a Nevada corporation headquartered in Rancho Santa Margarita, California. Steven acquired it in 2014. It previously manufactured electronic

3

devices, but it abandoned this business after the acquisition and began producing stevia-based sweeteners.[2] Due to this change in business, SweeGen did not have any revenue or employees after its acquisition until late 2017. It has grown dramatically since then. It went from having one employee in 2017 to 27 employees in 2020. It nearly doubled its gross revenues from 2017 to 2018. Still, despite this growth, an income statement for the fiscal year ending June 2019 shows SweeGen was operating at a net loss in the millions.

Steven and his spouse, defendant Min (also known as Diana Chen), are the majority shareholders of SweeGen through their trust, the Chen Family Trust Dated 7/16/2003 (Chen trust). Steven is the chief executive officer (CEO), president, and the sole board member of SweeGen. Min is involved with directing financial operations at SweeGen, but her official title is unclear. Defendants' briefs treat Min as a de facto officer or director of the company, so we will treat her as such for purposes of this appeal. Defendant Lucas Wenthe is SweeGen's vice-president of business development.

Steven, or the Chen trust, is also the founder and controlling shareholder of several other entities, including defendants (1) Conagen, Inc. (Conagen), (2) Phyto Tech Corp., doing business as Blue California (Blue California), (3) ProTab Laboratories (ProTab), (4) Anhui Longking Biotechnology Co., Ltd. (Anhui), and (5) Bug Venture LLC (Bug Venture). Min also holds a number of positions at these entities, including director of Conagen, chief operating officer of Blue California, and president of ProTab. We will refer to these five entities as the Chen affiliates and will use the term "defendants" to refer to all the defendants except for SweeGen.

Many of the Chen affiliates provide services and products that complement SweeGen's business. Conagen holds a large intellectual property portfolio relating to stevia sweeteners. SweeGen became the exclusive licensee of this portfolio in November

_____

[2] Stevia-based sweeteners are zero-calorie sugar substitutes that are derived from the stevia plant.

4

2016. Blue California imports and sells botanical ingredients. Among other things, Blue California assists SweeGen with consulting work and product shipments. ProTab formulates and blends neutraceutical and dietary supplement products. Among other things, ProTab assists SweeGen with converting liquid formulations into powder (known as spray drying). Anhui is an overseas manufacturer of stevia-based products. As of 2020, it is SweeGen's exclusive product manufacturer.[3]

B. *Plaintiffs Invest in SweeGen*

SweeGen began seeking investors in early 2018. Between April 2018 and April 2019, plaintiffs ODG SweeGen LLC, Harold Handelsman Revocable Trust (the Handelsman trust), Marstar Investments LLC, John M. Pigott, John D. Howard, Barbra Womble, Christopher Bancroft, SweeGen Investment Fund, LLC, SHG Planning Inc., 401k Evergreen Life in Respect of Its Segregated Account 191, and the Hugh Bancroft Jr. Trust U/W Article Third (together plaintiffs) separately invested a total of $18.8 million in SweeGen. They purchased 1,575,444 shares of common stock, which represented 5.64 percent of SweeGen's shares.

In October 2019, a subset of plaintiffs—the Handelsman trust, Marstar Investments LLC, ODG SweeGen, LLC, and SweeGen Investment Fund LLC—invested additional money in SweeGen. They entered into note purchase agreements (NPAs) in which they agreed to purchase secured convertible promissory notes that could be converted into shares. This subset of plaintiffs conducted additional due diligence prior to entering their respective NPAs.

---

[3] The parties redacted much of this information in their briefs. However, the record contains instances where this information appears unredacted, including the trial court's July 9, 2020 minute order. We have included other purportedly confidential information that appears unredacted in the record.

*C. Plaintiffs' Complaint and Preliminary Injunction Motion*

Plaintiffs eventually became suspicious of several monetary transfers that SweeGen made to the Chens and the Chen affiliates. In May 2020, they made a demand under Corporations Code section 1601 et seq., for SweeGen to produce documents relating to those transfers. The documents and information produced by SweeGen (the section 1601 production) only raised further questions and concerns. So, plaintiffs filed this lawsuit asserting the following direct and derivative claims: (1) breach of fiduciary duty (derivative); (2) breach of fiduciary duty (direct); (3) conversion (derivative and direct); (4) aiding and abetting breaches of fiduciary duty (derivative and direct); (5) accounting (derivative and direct); (6) violations of Corporations Code section 1601 (direct); (7) unjust enrichment (derivative and direct); (8) civil conspiracy (derivative and direct); and (9) alter ego liability.

Plaintiffs then filed an ex parte motion for a preliminary injunction to enjoin SweeGen from engaging in any transactions with the Chens or the Chen affiliates without giving plaintiffs five days' notice and the opportunity to object. The motion identified several transactions made by SweeGen, which plaintiffs believed were evidence of self-dealing by the Chens. These transactions, which include numerous unexplained monetary transfers, among other things, are discussed in more detail in the analysis section below.

*D. Trial Court's Ruling*

The ex parte motion was initially set to be heard on June 9, 2020, but was continued to June 30. Defendants agreed to a temporary restraining order (TRO) during the interim period that required SweeGen to give notice to plaintiffs of any transactions with the Chens or the Chen affiliates outside the ordinary course of its business. Following oral argument on June 30, the trial court issued a written order granting plaintiffs' motion. It issued an injunction that "prohibit[ed] defendants from engaging in

6

any transaction with, transferring funds or assets to, or entering into agreements or altering agreements (other than in the ordinary course of its daily business) with the Chens or affiliates of the Chens without disclosing the material terms of the transaction to plaintiffs at least 5 days in advance of the execution of any such transaction." The court also ordered plaintiffs to post a $210,000 bond per Code of Civil Procedure section 529, subdivision (a).

In granting the injunction, the trial court inferred based on the evidence "that the transactions in question were not 'fair' or made in SweeGen's interests," and it found that defendants did "not proffer[] any evidence . . . to counter that inference. For example, [Steven] failed to submit a declaration explaining even the most basic of the transactions referenced [by plaintiffs]." The court also found that the balance of harms favored plaintiffs. Since "[s]ignificant sums of money ha[d] regularly been transferred to interested parties without apparent justification," the court determined it was reasonably likely similar transactions would occur unless the injunction was granted. In contrast, defendants would suffer minimal harm if the injunction were granted, as they were "unable to point to any transaction which was so urgent that its consummation could not be delayed by 5 days." The court also noted that there was no showing that defendants had been burdened while the TRO was in place.

Defendants filed this appeal to the trial court's order. They make four arguments. First, there is insufficient evidence showing that plaintiffs were likely to prevail on their claims. Second, the court incorrectly determined that the balance of harms favored plaintiffs. Third, the injunction is unlawfully vague. Fourth, the court set the bond amount too low. On appeal, defendants have the burden of showing the preliminary injunction was improperly granted. (*Costa Mesa City Employees' Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 306 (*Costa Mesa*).) They have not met this burden, and we affirm the court's order.

7

II

DISCUSSION

A. *Evidentiary Objections*

Defendants made several objections to plaintiffs' evidence. The trial court only sustained one. It overruled the remaining objections or found that they were immaterial and declined to rule. In their briefs, defendants briefly suggest that the court improperly overruled their objections. If they sought to challenge the court's evidentiary rulings on appeal, they were required to specifically raise the issue in their briefs and provide argument as to how the court erred. (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 183.) They did not, so we will ignore their suggestions that the court erred in its evidentiary rulings.

B. *Legal Standard*

"The general purpose of a preliminary injunction is to preserve the status quo pending a determination on the merits of the action." (*SB Liberty, LLC v. Isla Verde Assn., Inc.* (2013) 217 Cal.App.4th 272, 280.) Courts review two interrelated factors when determining whether to grant a preliminary injunction: "(1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief. . . . '*The ultimate goal of any test to be used in deciding whether a preliminary injunction should issue is to minimize the harm which an erroneous interim decision may cause.*'" (*White v. Davis* (2003) 30 Cal.4th 528, 554.) "The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." (*Butt v. State of California* (1992) 4 Cal.4th 668, 678.)

There are two types of injunctions. Prohibitory injunctions compel a party to refrain from a particular act, while mandatory injunctions compel a party to perform an

8

affirmative act.  (*URS Corp. v. Atkinson/Walsh Joint Venture* (2017) 15 Cal.App.5th 872, 884.)  Here, the trial court granted a mandatory injunction,[4] which are reserved for """"extreme cases where the right thereto is clearly established."""" (*Integrated Dynamic Solutions, Inc. v. VitaVet Labs, Inc.* (2016) 6 Cal.App.5th 1178, 1183-1184 (*Integrated Dynamic*).)  Both types of injunctions are reviewed under the abuse of discretion standard, in which the trial court's decision will only be reversed if it """"exceed[s] the bounds of reason or contravene[s] the uncontradicted evidence."""" (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69.)  However, mandatory injunctions are """"scrutinize[d] more closely for abuse of discretion."""" (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1047-1048.)

The trial court's factual findings underlying a preliminary injunction are reviewed for substantial evidence.  (*Integrated Dynamic*, *supra*, 6 Cal.App.5th at pp. 1183-1184.)  Thus, """"we must interpret the facts in the light most favorable to the prevailing party and indulge in all reasonable inferences in support of the trial court's order."""" (*Costa Mesa*, *supra*, 209 Cal.App.4th at p. 306.)  Further, we """"must *presume* that the record contains evidence to support every finding of fact . . . . "" [Citations.]  It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence.  [Citation.]  This burden is a 'daunting' one." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)  "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

---

[4]  After this appeal was filed, the court clarified that the injunction was mandatory in a minute order dated November 19, 2020.  We advised the parties of our intent to take judicial notice of the minute order filed in the superior court on November 19, 2020.  Neither party objected.  Accordingly we take judicial notice of the document.

*C. Likelihood of Prevailing on the Merits*

We start with plaintiffs' claims for breach of fiduciary duty and aiding and abetting breaches of fiduciary duty. Since we conclude that plaintiffs have shown a significant likelihood of prevailing on these claims, we need not examine the likelihood that they will prevail on any of their other claims. (See *Huong Que, Inc. v. Luu*, *supra*, 150 Cal.App.4th at p. 408.)

The breach of fiduciary duty claims are asserted against Wenthe and the Chens as individuals and as trustees of the Chen trust, and the aiding and abetting claims are asserted against defendants. Both sides agree that Nevada law applies to these claims for purposes of this appeal. Under Nevada law, "[a] breach of fiduciary duty claim requires Plaintiffs to show the existence of a fiduciary duty, the breach of that duty, and that the breach proximately caused the damages." (*Brown v. Kinross Gold U.S.A., Inc.* (D. Nev. 2008) 531 F.Supp.2d 1234, 1245.) An aiding and abetting claim requires a showing that the aider and abettor "knowingly and substantially participated in or encouraged [the] breach." (*Guilfoyle v. Olde Monmouth Stock Transfer* (2014) 130 Nev. 801, 812-813 [335 P.3d 190, 198].)

"A corporate officer or director stands as a fiduciary to the corporation." (*Leavitt v. Leisure Sports Incorporation* (1987) 103 Nev. 81, 86 [734 P.2d 1221, 1224].) Majority shareholders also owe fiduciary duties to minority shareholders. (*Cohen v. Mirage Resorts, Inc.* (2003) 119 Nev. 1, 11-12 [62 P.3d 720, 727]; *Foster v. Arata* (1958) 74 Nev. 143, 155 [325 P.2d 759, 765] (*Foster*), abrogated on other grounds by *Guzman v. Johnson* (2021) 137 Nev. Adv. Op. 13 [483 P.3d 531] (*Guzman*).) As fiduciaries, both groups must act in good faith and in fairness to the company rather than their own self-interest. (*In re Amerco Derivative Litigation* (2011) 127 Nev. 196, 223-224 [252 P.3d 681, 700-701]; *Foster*, at p. 765.)

Defendants argue that plaintiffs have not provided enough evidence to hold the Chens and Wenthe liable. Their argument is based on Nevada Revised Statutes

10

section 78.138(7), which applies a two-pronged analysis to determine whether an officer or director of a company can be held individually liable.[5] First, the plaintiff must rebut the business judgment rule, which presumes that officers and directors "act in good faith, on an informed basis and with a view to the interests of the corporation." (§ 78.138(3); *Guzman*, *supra*, 483 P.3d at pp. 533-534.)[6] The plaintiff may rebut the business judgment rule by "showing that the fiduciary had a personal interest in the transaction." (*Guzman*, at p. 537.)

Second, if the plaintiff rebuts the business judgment rule, it must then show that the officers or directors breached their fiduciary duties through "intentional misconduct, fraud, or a knowing violation of law." (§ 78.138(7); *Guzman*, *supra*, 483 P.3d at p. 536.) Where the claim is based on intentional misconduct or violations of law, "the claimant must establish that the director or officer had knowledge that the alleged conduct was wrongful . . . ." (*Chur v. Eighth Judicial District Court* (2020) 136 Nev. 68, 75 [458 P.3d 336, 342].)

Defendants' argument that plaintiffs have not met their burden under section 78.138(7) overlooks the fact that this case does not just involve officers and directors. The Chens are also SweeGen's majority shareholders, which section 78.138(7) does not cover. (§ 78.138(7); see, e.g., *Guzman*, *supra*, 483 P.3d at p. 535.) As majority shareholders, *the Chens* had the burden to "'not only . . . prove the good faith of the

---

[5] All further statutory references are to the Nevada Revised Statutes unless otherwise specified.

[6] Nevada case law previously suggested the burden on the first prong was flipped when interested transactions were involved, i.e., officers and directors had the burden of proving interested transactions were fair and in the best interests of the company. The Nevada Supreme Court recently held in *Guzman* that the plaintiff bears the burden on this prong. (*Guzman*, *supra*, 483 P.3d at p. 534.) *Guzman* was filed on March 25, 2021, months after this case had been fully briefed. On March 30, we filed an order allowing the parties to address the impact of *Guzman* on this appeal. Both parties filed supplemental letter briefs on April 9.

11

transaction[s] but also to show [their] inherent fairness from the viewpoint of the corporation and those interested therein.'" (*Foster*, *supra*, 325 P.2d at p. 765.) Regardless, plaintiffs have shown they are likely to prevail on their fiduciary duty claims even if the higher standard in section 78.138(7) is applied to the Chens.

### 1. *Business judgment rule*

Plaintiffs have rebutted the business judgment rule. The trial court found SweeGen had engaged in numerous transactions that "were not fair to, or in the best interests of, SweeGen." This finding is supported by substantial evidence. When viewing the entire record, it can be reasonably inferred that the Chens used SweeGen as part of a self-dealing scheme and were aided and abetted by the Chen affiliates and Wenthe. Among other things, the record shows the Chens and/or Wenthe (1) caused SweeGen to make numerous unexplained monetary transfers to the Chens and the Chen affiliates; (2) caused SweeGen to enter into an unfair royalty agreement with Conagen; (3) altered SweeGen's financial statements; and (4) misrepresented the price Bug Venture paid for a production facility in order to sell it to SweeGen at a grossly inflated price.

Before reviewing the relevant transactions, we address one of defendants' primary arguments that most of the questionable monetary transfers were loans to the Chens and the Chen affiliates that were repaid, usually with interest. They suggest that such loans are common: "most startups are not profitable for their few years of existence, and most startups obtain working operating capital from loans." But this argument only underscores the suspicious nature of the loans. SweeGen did not *obtain* working capital in these transactions. Rather, it loaned its capital to the Chens and Chen affiliates while operating at a net loss. Further, defendants do not explain the purpose of these loans, and there is other evidence of self-dealing in the record. Given this context, it is reasonable to infer that these loans were not made in good faith. Thus, without more, repayment of the

12

loans does not show that these interested transactions were fair and in SweeGen's best interests.

### a. Loan to the Chen trust

On May 8, 2018, the Chens and Wenthe caused SweeGen to transfer a significant sum of money to the Chen trust through an interest-free promissory note. The loan was due and payable on May 9, 2019, but a one-year extension was entered into between SweeGen and the Chen trust in May 2019. The note was signed solely by Steven for the Chen trust, and the extension was signed by Min for the Chen trust and Steven for SweeGen. The note was eventually repaid in March 2020, but, curiously, the payment was made by Blue California.

Plaintiffs learned about this loan in August 2019 when their representative was conducting due diligence in connection with the NPAs. When they inquired about the loan in September 2019, Wenthe stated it would be paid by the end of the year. He did not inform them that the maturity date on the loan had been extended until May 2020, and they did not learn about the extension until SweeGen produced the extension agreement in the section 1601 production. While the Chens and Wenthe told plaintiffs they would provide a business justification for the loan, none was ever given.

Defendants do not explain the purpose of this loan, and there is no obvious business reason for it. It is immaterial that the loan was eventually paid back. SweeGen was deprived of a significant sum of money—money a new business would presumably need—for nearly two years and appears to have received nothing in return, not even interest. Further, the loan was repaid by Blue California, not the Chens or the Chen trust. This is also unexplained. A logical and reasonable inference is that the Chens pocketed the money they received from SweeGen and used Blue California's funds to repay the loan.

13

Defendants argue that plaintiffs were aware of this loan when they invested in SweeGen. This argument is unpersuasive. There is substantial evidence that plaintiffs were unaware of the loan when they purchased SweeGen shares. At least two plaintiffs agreed to purchase shares before the loan to the Chen trust was made.[7] Further, plaintiffs purchased SweeGen shares between April 2018 and April 2019, while the record shows they first learned of this loan in August 2019. Besides, defendants cite no authority that plaintiffs' knowledge of this transaction precludes a breach of fiduciary duty claim.

### b. Conagen transactions

In the initial 2016 royalty agreement, SweeGen agreed to pay Conagen an annual $2 million minimum royalty plus a percentage of net sales. The parties executed a first amendment in August 2017, which removed the minimum royalty requirement and instituted royalties in the amount of 5 percent of annual net sales with a $15 million annual cap. Then, in June 2019, a few months after plaintiffs had purchased shares, the royalty agreement was amended a second time. The second amendment kept royalties at 5 percent of net sales but reinstituted the $2 million minimum royalty and made it retroactive to July 1, 2018 (the start of SweeGen's fiscal year). The second amendment was signed by Steven as both president of Conagen and president and CEO of SweeGen.

From May to July 2019, the Chens transferred $4 million from SweeGen to Conagen. They told plaintiffs that $2 million had been transferred as a retroactive minimum royalty payment for the fiscal year starting July 1, 2018. The remaining $2 million, they claimed, was a prepayment on royalties for the next fiscal year 2019. The prepayment explanation was peculiar since the second amendment specified that royalties would be payable at the end of each fiscal year.

---

[7] The Handelsman trust purchased shares on May 4, 2018, days before the loan was made. Plaintiff SweeGen Investment Fund LLC signed a subscription agreement on April 5, 2018, and then wired investment funds in July 2018.

14

The trial court found the timing of these amendments to be suspicious: "Defendants have not explained why these amendments were made at the time they were made. Nor have they explained why the $2,000,000 lump-sum royalty obligation, eliminated in 2017 at a time when plaintiffs were considering investing in SweeGen, was revived in 2019 *after* plaintiffs' investment. They also do not explain why the obligation to pay the lump sum royalty was made retroactive to July 2018 to the apparent detriment of SweeGen and the benefit of Conagen. The court infers from defendants' failure to explain the reasons for and the timing of these amendments, that the elimination of the lump sum royalty in 2017 was intended to enhance SweeGen's financial condition at a time when plaintiffs were contemplating investment in that corporation, while the retroactive reinstatement of the lump sum royalty obligation ensured Conagen was not prejudiced by its short-lived elimination."

The trial court's findings are supported by sufficient evidence. They can be inferred from the timing and substance of the amendments, and we accept this inference on review. (*Clare v. State Bd. of Accountancy* (1992) 10 Cal.App.4th 294, 300.) From this, we conclude the second amendment was made to further Conagen's financial interests, without regard for the interests of SweeGen.

Defendants argue that SweeGen always intended for the $2 million royalty payment to remain in place. They cite a portion of a declaration from Wenthe, which states that the parties "executed a written amendment to the Original License Agreement . . . . Subsequently, in June of 2019 [the parties] executed" a second amendment "clarifying that the $2 million minimum royalty payment would be in effect . . . ." This evidence does not satisfactorily explain why the minimum royalty payment was removed by the first amendment and then added again in the second amendment and applied retroactively. To the extent it means the minimum royalty was unintentionally omitted from the first amendment, the trial court did not find this evidence credible. We do not question this finding on appeal. (*Provencio v. WMA*

15

*Securities, Inc.* (2005) 125 Cal.App.4th 1028, 1031.) Further, defendants' assertion is undermined by a presentation given by SweeGen to potential investors, including plaintiffs. The presentation states SweeGen pays Conagen a fee of 5 percent of revenues with a $15 million cap. It does not mention any minimum.

Defendants also contend the second amendment is fair to SweeGen because a flat royalty of $2 million is less expensive than being billed for each service Conagen provides. But this argument does not address the inference that the amendments were made in bad faith. Further, the $2 million fee is not a flat rate. It is a floor that ensures Conagen is paid at least $2 million in royalties regardless of SweeGen's net sales. Under the first amendment, which had no minimum, SweeGen would have paid far less in royalties in 2018 and 2019. It would have needed to generate $40 million in annual net sales for Conagen to earn a $2 million royalty payment in those years. SweeGen's net sales were nowhere near that amount. It was not fair or in SweeGen's best interests to agree to pay substantially more in royalties without obtaining any additional benefits from Conagen.

In addition to the $4 million in royalty payments, the Chens also caused SweeGen to transfer another substantial amount of money to Conagen on January 7, 2020. When plaintiffs' representative met with the Chens and Wenthe and asked about the payment, Min stated it was for royalties. When plaintiffs reminded her that SweeGen had already prepaid the royalties a few months earlier, Min stated she would "'look into it'" but never gave plaintiffs an explanation. Defendants now maintain this money was transferred as part of an unsecured loan that Conagen later repaid with interest. But the loan agreement they cite, which is signed by Steven as president of SweeGen and Min as director of Conagen, is dated February 3, 2020, nearly a month after the transfer. Thus, this transfer appears to be undocumented. It can be inferred that it is further evidence of self-dealing. And even if it were a loan, it could still be interpreted as evidence of self-dealing. Defendants have not explained its purpose or why the funds were transferred

16

before the loan agreement was in place.  It is also unclear why SweeGen would loan Conagen money when it was already paying millions of dollars in royalties.

### c.  Transfers to ProTab

SweeGen transferred millions of dollars to ProTab in October and November 2019.  When plaintiffs inquired about the transfer, they were not given a satisfactory explanation.  Rather, Min stated, "[T]he purpose of the transactions may have been to prop up ProTab's 'short-term liquidity.'"

In their opening brief, defendants claimed these transfers were made under a loan agreement between the two companies, which was signed by Steven for SweeGen and Min for ProTab.  However, plaintiffs identified several inconsistencies between that loan agreement and the transfers in their respondent's brief.  The loan agreement was dated January 6, 2020, after the money was transferred.  Further, the amounts transferred were greater than the amount of the loan.  In their reply brief, defendants claimed the documentation supporting the October and November 2019 transfers "relie[s] on unsubstantiated bank records relating to completely different transactions that had nothing to do with the . . . loan to ProTab."  They also note that these transfers were quickly repaid by ProTab.

It is unclear why SweeGen loaned ProTab money and also made additional transfers of funds outside that loan agreement.  Defendants offer no explanation for any of these transactions.  The only explanation we find in the record is that the October and November 2019 transfers were made to "prop up ProTab's 'short-term liquidity.'"  In other words, a factfinder could reasonably infer the transfers were made to boost the financial health of the Chen-owned ProTab without regard for SweeGen's interests.  As such, a factfinder could conclude they are further evidence of self-dealing by the Chens.

17

### d. *Transfers to Blue California*

From February 2019 through December 2019, SweeGen wired millions of dollars to Blue California. Defendants contend that a portion of the sums transferred to Blue California were payments for services and goods, and they provide supporting invoices. They claim the remaining sums were transferred under an August 2019 loan agreement, which was signed by Steven as SweeGen's CEO and Min as Blue California's chief operating officer. Blue California repaid this loan with interest in March 2020. Again, defendants fail to explain the purpose of this loan. Similar to the Conagen loan, it is unclear why SweeGen would loan Blue California money when it was already paying it millions of dollars for products.

### e. *SweeGen's financial statements*

Plaintiffs assert that the Chens and Wenthe have caused improper alterations to be made to SweeGen's financial statements. Defendants failed to address plaintiffs' evidence on this issue in the trial court, which was noted in the court's minute order. While not explicitly stated in the minute order, we infer that the court found that SweeGen falsified its financial statements. (See *Ochoa v. Anaheim City School Dist.* (2017) 11 Cal.App.5th 209, 235.) This finding is supported by substantial evidence.

A declaration from plaintiffs' representative states that SweeGen's "financial records are inaccurate, have intentionally been altered, and cannot be relied upon." The representative also states that the Chens and Wenthe instructed SweeGen's controller on several occasions to record revenue without providing any supporting documentation. There are also several unexplained discrepancies between SweeGen's internal balance sheet and the balance sheet given to investors. The investor balance sheet shows less inventory on hand and higher account receivables than the internal balance sheet. Consequently, the investor balance sheet makes it appear as if SweeGen has sold more inventory, artificially inflating SweeGen's financial condition.

18

Defendants offer no substantive rebuttal. Instead, they argue that plaintiffs failed to raise this issue in their ex parte application and that it is surprising that they would raise this issue now. Defendants also argue that the financial statements are not connected to plaintiffs' claims. We are not persuaded. Plaintiffs' breach of fiduciary duty claim specifically alleges that defendants breached their fiduciary duties by falsifying financial statements to cover-up their self-dealing. Their ex parte motion was accompanied by declarations containing facts supporting these allegations. And the trial court addressed this issue in its minute order. Accordingly, it is unsurprising that plaintiffs would discuss SweeGen's financial statements on appeal.

### f. Bug Venture acquisition

Around mid-2018, SweeGen began looking to acquire a new production facility in Europe. Conagen located a potential facility (the European facility) and presented the opportunity to SweeGen, but it did not acquire the European facility. Instead, Steven acquired the European facility through Bug Venture. In August 2019, certain plaintiffs attended an investor retreat with the Chens and Wenthe. Steven informed them that Bug Venture had acquired the European facility for a vast sum of money. He wanted SweeGen to buy it from Bug Venture with SweeGen shares for the lesser of cost or its appraised value, but he refused to provide documentation for the purchase price. Plaintiffs later discovered that Bug Venture had purchased the European facility for a nominal amount, which was thousandths of a percent of the amount Steven had claimed. Even after this discovery, Steven still proposed that SweeGen pay the full purchase price with SweeGen stock.

Defendants do not contest that Steven misrepresented the price Bug Venture paid for the European facility. Instead, they argue that negotiations between Bug Venture and SweeGen are ongoing and that plaintiffs have been involved in the negotiation process. This is immaterial. The relevant point is that there is evidence

19

Steven grossly misrepresented the price paid by Bug Venture and then attempted to have SweeGen purchase the European facility at the misrepresented price. While the transaction has not been finalized, it is further evidence of the Chen's attempts to engage in self-dealing.

### g. *Payments to Anhui and other vendors*

SweeGen's financial statements show that millions of dollars have been paid for "cost of goods" between June 2018 and March 2020. Given that Anhui is SweeGen's sole supplier of products, plaintiffs requested documentation to substantiate all monetary transfers that SweeGen made to Anhui. Defendants have only produced a single invoice from Anhui dated January 14, 2020, which was a prepayment for products. Defendants do not claim this invoice reflects the entire amount SweeGen transferred to Anhui, and the invoice appears to document only a fraction of the sums transferred.

Defendants argue the "cost of goods" on their financial statements relates to inventory purchases from multiple vendors, such as Blue California. Yet even if this is true, defendants do not identify any other vendors other than Blue California. Nor do they provide any evidence showing how much money has been paid to Anhui since 2018 and what SweeGen received in return. In short, it is unclear what SweeGen has done with substantial sums of money. In particular, the sums transferred to Anhui. While this would likely be insufficient on its own to raise an inference of self-dealing, these unexplained and undocumented transfers must be viewed along with the other evidence of self-dealing above. When placed within this context, it is not unreasonable to infer that some of the undocumented sums transferred to Anhui were the product of self-dealing.

### 2. *Intentional misconduct, fraud, or violation of law*

The second prong of the analysis requires us to determine whether the individual defendants engaged in intentional misconduct, fraud, or a knowing violation of

20

law.  (Nev. Rev. Stat. § 78.138(7) (2019).)  Defendants primarily focus on the first prong discussed above.  As to the second prong, they generally argue that plaintiffs did not provide any evidence that the individual defendants "acted with intent or knowledge of breaching fiduciary duties."[8]  We disagree.  As set forth above, there is sufficient evidence that would enable a factfinder to conclude that the Chens and Wenthe were knowingly engaged in a self-dealing scheme involving SweeGen and the Chen affiliates.  Given the number of transfers, the alteration of financial statements, and the misrepresentations, it can be inferred that the Chens and Wenthe knew their conduct was wrongful.

        3. *Damages*

Defendants also assert that plaintiffs have not shown a likelihood of success on the merits because they have not shown any damages for their claims.  We disagree.  Damages for the interest free loan to the Chen trust would reasonably include the amount of lost interest, at the very least.  There are also millions of dollars in unaccounted transfers, for which damages may be appropriate.  Further, as explained in part D, *infra*, the self-dealing scheme likely diluted the value of SweeGen and/or plaintiffs' shares.

Defendants also believe the court erred by failing to analyze damages, but we are "required to infer that the trial court made all factual findings necessary to support the order or judgment."  (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1271.)  Further, it is clear the court considered damages in its analysis, as it raised the issue during oral argument.

## D.  *Balance of the Harms*

In balancing the harms, courts typically consider "'such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of

---

[8]  Defendants argue that this must be shown as to each defendant.  But all their arguments are collective; they make no specific arguments on behalf any individual defendant.

preserving the status quo.'" (*Take Me Home Rescue v. Luri* (2012) 208 Cal.App.4th 1342, 1350.)  "'To obtain a preliminary injunction, a plaintiff ordinarily is required to present evidence of the irreparable injury or interim harm that it will suffer if an injunction is not issued pending an adjudication of the merits.' [Citations.]  While the mere possibility of harm to the plaintiffs is insufficient to justify a preliminary injunction, the plaintiffs are 'not required to wait until they have suffered *actual harm* before they apply for an injunction, but may seek injunctive relief against the *threatened infringement* of their rights.'" (*Costa Mesa*, *supra*, 209 Cal.App.4th at p. 305.)  "[A]n injunction may be granted as to past acts if there is evidence that they will probably recur." (*Fretz v. Burke* (1967) 247 Cal.App.2d 741, 744.)

Defendants' primary argument is that all of plaintiffs' claims are compensable with monetary damages.  In such a case, they assert irreparable harm can only be established if damages are difficult to ascertain or there is a risk that defendants will become insolvent. (Citing *West Coast Constr. Co. v. Oceano Sanitary Dist.* (1971) 17 Cal.App.3d 693, 700; *Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 801.)  They believe there is no evidence that either exception applies.

The trial court did not appear to rely on either of these exceptions.  Instead, it cited a Ninth Circuit opinion, *Johnson v. Couturier* (9th Cir. 2009) 572 F.3d 1067, and found the injunction was proper to prevent further self-dealing from occurring during the duration of this case.  We need not determine whether the court improperly relied on or misinterpreted *Johnson v. Couturier*, *supra*, 572 F.3d 1067.  "On appeal, we review the correctness of the trial court's ruling, not its reasoning." (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1049.)  Here, the court's ruling is correct because damages would be difficult to ascertain.

For example, *Wind v. Herbert* (1960) 186 Cal.App.2d 276 (*Wind*) involved a partnership where the plaintiffs were limited partners, and the defendants were general

22

partners and general managers of the partnership's business. (*Id.* at p. 279.) Defendants violated a provision of the partnership agreement that required consent of at least one of the plaintiffs to withdraw funds from the partnership's bank account. Defendants refused to explain or account for the withdrawn funds. (*Id.* at pp. 280-281.) The trial court issued a preliminary injunction preventing defendants from withdrawing any further funds without the approval of at least one of the plaintiffs. (*Id.* at p. 279.)

On appeal, the appellate court rejected defendants' argument that plaintiffs' claims could be compensated with damages. (*Wind*, *supra*, 186 Cal.App.2d at pp. 284-285.) It found that without the injunction, defendants could "continue to dissipate the assets of the partnership by unwise and unauthorized disbursements to themselves or others from partnership funds over which defendants have usurped complete control." (*Id.* at p. 285.) Any further disbursements might be untraceable and an "accounting ordered by the court . . . might not fully disclose the damages suffered by plaintiffs." (*Ibid.*)

Here, given the numerous unexplained transfers that have already occurred, there is sufficient evidence to infer that the Chens will continue to improperly transfer SweeGen's funds to themselves and the Chen affiliates. There have already been several unexplained and undocumented transfers to various Chen affiliates. As noted above, it is unclear how much money has already been transferred to Anhui. As in *Wind*, there is an appreciable risk that without the injunction defendants will continue to engage in improper transfers that will ultimately be untraceable and uncaptured in an accounting.

Moreover, the complaint alleges that defendants' conduct has decreased the value of SweeGen's stock. The trial court alluded to such damages during oral argument, as it inquired, "[H]ow can interested transactions of huge loans not harm the company derivatively or dilute the shares of the individuals when the statements show a net loss"? We agree that further self-interested transactions will likely decrease the value of

23

SweeGen as a company and the value of plaintiffs' shares. The exact amount of these damages will be difficult to ascertain.

In contrast, defendants have not shown they will suffer any harm or burden if they are required to disclose interested transactions outside the ordinary course of SweeGen's daily business five days before execution. While they argue that SweeGen's business requires it to work closely with the Chen affiliates, they do not explain how the injunction will interfere with these business relationships. They cite a rush request received from an unaffiliated client on June 10, 2020, which required them to produce and ship samples before June 23. But defendants fail to explain how the notice requirement would have delayed or negatively affected that order. Further, the injunction only requires defendants to give notice of the transactions. It provides no mechanism for plaintiffs to veto or halt a transaction, which plaintiffs acknowledge in their respondents' brief. As such, even if the plaintiffs disagreed with a transaction, the injunction does not enable them to stop SweeGen from executing it. Finally, the injunction exempts transactions done "in the ordinary course of [SweeGen's] daily business." Thus, it appears that most—if not all—necessary business transactions between SweeGen and the Chen affiliates would be exempt from the notice requirement.

Defendants also contend the injunction is unnecessary because plaintiffs can obtain information about interested transactions through corporate records requests. This argument is disproved by the record. Plaintiffs filed this lawsuit because the information produced in the section 1601 production was not helpful in explaining and documenting the various transfers made by SweeGen to the Chens and the Chen affiliates.

The balance of harms is considerably tilted toward plaintiffs. Since plaintiffs have also shown a significant chance of prevailing on the merits, the trial court did not abuse its discretion by granting a mandatory injunction. The right to the

24

injunction was clearly established. (*Integrated Dynamic*, *supra*, 6 Cal.App.5th at pp. 1183-1184.)

*E. Vagueness of the Injunction*

"'An injunction must be sufficiently definite to provide a standard of conduct for those whose activities are to be proscribed, as well as a standard for the court to use in ascertaining an alleged violation of the injunction.' [Citation.] 'An injunction which forbids an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application exceeds the power of the court.' [Citation.] However, '[t]he injunction need not etch forbidden actions with microscopic precision, but may instead draw entire categories of proscribed conduct. Thus, an injunction may have wide scope, yet if it is reasonably possible to determine whether a particular act is included within its grasp, the injunction is valid.'" (*People ex rel. Gascon v. HomeAdvisor, Inc.* (2020) 49 Cal.App.5th 1073, 1082-1083.)

Defendants appear to make two vagueness arguments. They primarily argue that the injunction interferes with their business activities and makes the plaintiffs de facto board members. This argument does not address vagueness. It just reiterates the harms defendants believe SweeGen will face if the injunction is granted. As addressed above, defendants have not provided any evidence to support these assertions.

Defendants' second argument focuses on the exemption from the notice requirement of transactions done "in the ordinary course of [SweeGen's] daily business." They maintain this phrase is impermissibly vague. Not so. Similar phrases are frequently used in contracts and statutes. (See e.g., Rev. & Tax. Code, § 997, subd. (c); Cal. U. Com. Code, § 7102, subd. (a)(5); Ins. Code, § 4044; *Hernandez v. Enterprise Rent-A-Car Co. of San Francisco* (2019) 37 Cal.App.5th 187, 200.) The phrase is not so vague that its meaning must be guessed. It is reasonably possible to determine whether a

25

transaction or agreement fits within the scope of SweeGen's ordinary course of daily business.

*F. Amount of the Bond*

In determining the amount of the bond, "the trial court's function is to estimate the harmful effect which the injunction is likely to have on the restrained party, and to set the undertaking at that sum. [Citations.] That estimation is an exercise of the trial court's sound discretion, and will not be disturbed on appeal unless it clearly appears that the trial court abused its discretion by arriving at an estimate that is arbitrary or capricious, or is beyond the bounds of reason." (*Abba Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 14.) "When an injunction restrains the operation of a business, foreseeable damages include 'the profits which [defendants] would have made had he not been prevented by the injunction from carrying on his business.'" (*Ibid.*) Here, the trial court set the amount of the bond amount at $210,000, which it found to be a reasonable estimate of defendants' potential attorney fees. It did not find any evidence of business interruption.

Defendants contend the court erred by failing to consider evidence showing the injunction could cause them to lose up to $5 million in business. But the trial court expressly considered this evidence and found it unpersuasive. Defendants' provided a declaration from Wenthe generally stating that SweeGen cannot provide products for its customers without support from the Chen affiliates. As discussed above, this evidence does not explain how the injunction will interfere with business dealings between SweeGen and the Chen affiliates. Based on the record, we cannot find the trial court abused its discretion.

Defendants also claim the court improperly ignored their counsel's declaration stating "that litigating this matter through trial may well exceed $3 million in attorneys' fees and costs . . . ." The trial court found this overall estimate to be

conclusory and unpersuasive.  It noted that other than billing rates, the declaration lacked "any information or specificity as to the type or amount of work required."  The court found $210,000 to be a reasonable fee estimate, which would cover 300 hours of work billed at $700 an hour.  It also noted that "the vast majority of actions do not result in a trial but are usually resolved after the completion of key depositions, focused written discovery and efficient document production."

The court did not abuse its discretion by rejecting counsel's fee estimate.  It was unconvinced by the supporting evidence, so it methodically determined an appropriate amount based on its own observations and experience.  The court's analysis was reasonable.


# III

## DISPOSITION

The order is affirmed.  Plaintiffs are entitled to their costs on appeal.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.


27