Filed 6/23/22  SMC Speciality Finance v. Zhengfu Pictures Limited CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SMC SPECIALTY FINANCE, LLC,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ZHENGFU PICTURES LIMITED,<br><br>    Defendant and Appellant. | B314024<br><br>(Los Angeles County Super. Ct. No. 21SMCV00716) |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Young, Judge.  Affirmed.

Zhong Lun Law Firm and Leodis C. Matthews for Defendant and Appellant.

Raskin Gorham Anderson Law, Scott J. Tepper, and Gary J. Gorham for Plaintiff and Respondent.

\* \* \* \* \* \*

This is a tale about the making of two movies set during World War II, which has spawned a minor skirmish of its own. A Chinese-based company agreed to help a Hollywood studio finance and distribute a film depicting World War II called *Greyhound*. In order to finance a second World War II film called *Destroyer*, the company surrendered its rights under the *Greyhound* contract as collateral for a short-term loan. When the company defaulted, the lender foreclosed and took title to those rights. The Chinese company and the lender have now sued each other, chiefly over the company's postforeclosure epiphany that it did not have the power to surrender its rights under the *Greyhound* contract. Immediately after filing a cross-complaint, the Chinese company sought a preliminary injunction that would turn back time by nullifying the lender's foreclosure. The trial court declined to issue the injunction. Because that was not an abuse of discretion, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Distribution and financing of* Greyhound

*Greyhound* is a film set during World War II and stars Tom Hanks.

In July 2017, Sony Pictures Worldwide Acquisition Inc. (Sony) entered into a "co-financing and distribution" agreement for *Greyhound* (the *Greyhound* Agreement) with a Chinese company called Zhengfu Pictures Limited (Zhengfu). Under the *Greyhound* Agreement, Sony and Zhengfu agreed that (1) each

2

would contribute money toward the production of the film, (2) each would collect "certain additional revenues" from the film, (3) each would own a share of the film's copyrights, and (4) Zhengfu would have a 15-year exclusive license to distribute the film in mainland China as well as the right to negotiate for the right to distribute the film in Hong Kong, Taiwan, and Macau.

The only person Sony dealt with on behalf of Zhengfu was Alex Zhang (Zhang).  Consistent with his primary role, Zhang was listed as an "executive producer" during the end credits of the *Greyhound* film.

**B.** ***Zhengfu finances* Destroyer *by offering up its rights in the* Greyhound *Agreement as collateral*

Zhengfu and another Chinese company called Beijing Zhumeng Qiming Culture & Art Co., Ltd. (Zhumeng) formed a British Virgin Islands-based company called Golden Title Investments Limited (Golden Title) in order to finance another World World II film called *Destroyer*.[1]  Zhang is a principal of Golden Title.

In October 2018, Golden Title signed an agreement (Bridge Loan Agreement) to obtain a shorter-term, so-called "bridge loan" of up to $5.33 million from SMC Specialty Finance, LLC (SMC Specialty).  SMC Specialty is a California-based company in the business of making bridge loans to film financiers.

As "collateral" for the bridge loan to Golden Title to finance *Destroyer*, Zhengfu granted SMC Specialty a "first-priority security interest" in all of Zhengfu's "assets, rights and entitlements" under the *Greyhound* Agreement.  To effectuate the use of Zhengfu's interest in the *Greyhound* Agreement as

---

[1]     Interestingly, Zhumeng also participated in the financing of a third World War II film called *Midway*.

3

collateral for the *Destroyer* bridge loan, Zhengfu and SMC Specialty executed (1) an Accommodation and Security Agreement, (2) a Copyright Mortgage and Assignment, and (3) a Power of Sale and Power of Attorney. Zhang signed these documents on behalf of Zhengfu.

SMC Specialty thereafter perfected its security interest by filing a UCC-1 form.

### C.     *Golden Title defaults on the bridge loan*

Golden Title ended up borrowing $4.305 million under the Bridge Loan Agreement and did not repay any of it.

In April 2019 and again in early June 2020, SMC Specialty provided Zhengfu with written notice of its liability for Golden Title's outstanding debt, which by early June 2020 totaled $10,353,950.

In late June 2020, SMC Specialty wrote to Sony, informing it that Zhengfu had pledged its interest in the *Greyhound* Agreement, and asking Sony to provide its records so that SMC Specialty could receive Zhengfu's share of the revenue stream from the movie's distribution, which was to be released on the Apple TV+ streaming platform in July 2020.

On September 21, 2020, SMC Specialty held a foreclosure sale for Zhengfu's rights under the *Greyhound* Agreement, purchased those rights on a credit bid, and thus took title to those rights.

### D.     *Postforeclosure events*

The day after the foreclosure sale, SMC Specialty wrote to Sony, informing it of the sale and asking Sony to hold Zhengfu's revenues in a separate account and to provide an accounting of those revenues. SMC Specialty has taken no further action to collect on Zhengfu's rights under the *Greyhound* Agreement: It

4

has not sought to distribute the *Greyhound* film in mainland China, and it has taken no further actions to collect Zhengfu's share of revenues currently being held by Sony and other third parties. Indeed, SMC Specialty has offered to stipulate that Sony and the other third parties may continue to collect and hold those funds until the lawsuits discussed below are resolved.

Also after the foreclosure sale, Zhengfu for the first time denounced as void Zhengfu's grant of a security interest in its rights under the *Greyhound* Agreement, asserting that Zhang's position at Zhengfu was little more than as a glorified translator and go-between and, in the alternative, that Zhang had forged Zhengfu's company seal.

In response to these conflicting positions, Sony informed Zhengfu and SMC Specialty that it "has no choice but to hold payment" of the revenues owed to Zhengfu "until [Sony] can resolve the dispute between Zhengfu and SMC [Specialty] regarding which entity is the rightful beneficiary of the Zhengfu [p]ayment[s]."

## II. Procedural Background

### A. *Pleadings*

In April 2021, SMC Specialty sued Zhengfu, and others, for declaratory relief. As pertinent here, SMC Specialty seeks a declaration that its perfected security interest in Zhengfu's rights under the *Greyhound* Agreement as well as the subsequent foreclosure sale of those rights are both "valid and effective."[2]

---

[2] In the alternative, SMC Specialty also named Zhang (and Han Sanping, the principal of Zhumeng with whom it dealt) for fraud.

5

In May 2021, Zhengfu responded with a 56-page, 222-paragraph cross-complaint against SMC Specialty, Golden Title, and Zhang alleging eight different cross-claims. Among other causes of action, Zhengfu alleges three claims for declaratory relief seeking the inverse relief sought by SMC Specialty, and has also sued SMC Specialty for intentional interference with a contractual relationship, negligent interference with a prospective economic advantage, conversion, and unfair business practices.

**B.** *Zhengfu's requests for injunctive relief*

1. *The TRO*

The day after Zhengfu filed its cross-complaint, Zhengfu filed an ex parte application for a temporary restraining order (TRO) as well as a preliminary injunction. Zhengfu sought to enjoin SMC Specialty from engaging in five different activities, including "[i]nterfering with Zhengfu's contractual rights by communicating with third parties or taking any acts, apart from participating in this action, to interfere with or prevent Zhengfu's rights to obtain, possess and exercise its right to distribute the *Greyhound* motion picture in China."[3]

After an accelerated round of briefing, the trial court denied Zhengfu's ex parte application for a TRO. In its order denying relief, the court found that Zhengfu had not established a likelihood of prevailing on the merits and that the balance of harms "overwhelmingly favor[ed] SMC [Specialty]," particularly because "SMC [Specialty] . . . has not attempted to collect [on]

---

[3] This activity was the fifth listed. This was the only activity Zhengfu pursued as a basis for a preliminary injunction because it withdrew the other four activities after the TRO was denied.

6

any payment receivable[], and has not even begun the process of transferring or encumbering any of [Zhengfu's] assets or rights."

### 2. *The preliminary injunction*

After SMC Specialty filed a more fulsome opposition, after Zhengfu filed a reply, and after a hearing,[4] the trial court issued a written order denying Zhengfu's request for a preliminary injunction. In denying this relief, the court reasoned that Zhengfu had not demonstrated that it was likely to prevail on the merits of its cross-complaint because Zhengfu had "not shown that the [*Greyhound* Agreement] prohibited" the grant of its security interest to SMC Specialty and because the balance of harms favored SMC Specialty, as Zhengfu was in no danger of imminent harm given that "SMC [Specialty] has . . . done nothing [to distribute *Greyhound* or otherwise seek to collect Zhengfu's revenues under the *Greyhound* Agreement] since foreclosing on the security interest."

### C. *Appeal*

Zhengfu filed this timely appeal.

## DISCUSSION

Zhengfu argues that the trial court erred in denying its request for a preliminary injunction. "A trial court may grant a preliminary injunction upon a showing that (1) the party seeking the injunction is likely to prevail on the merits at trial, and (2) the 'interim harm' to that party if an injunction is denied is greater than 'the [interim] harm the [opposing party] is likely to suffer if the . . . injunction is issued.'" (*Integrated Dynamic Solutions, Ltd. v. VitaVet Labs, Inc.* (2016) 6 Cal.App.5th 1178, 1183 (*Integrated Dynamic*); *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1463; Code Civ. Proc., § 527, subd. (a).)

---

4       The hearing was not transcribed.

7

These two showings operate on a sliding scale: "[T]he more likely it is that [the party seeking the injunction] will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue." (*King v. Meese* (1987) 43 Cal.3d 1217, 1227.) We review a trial court's denial of a preliminary injunction for an abuse of discretion (*Integrated Dynamics*, at p. 1184), but review for substantial evidence any subsidiary factual findings (*ibid.*) and review de novo any subsidiary legal questions as well as the application of the law to any disputed facts (*City of Vallejo v. NCORP4, Inc.* (2017) 15 Cal.App.5th 1078, 1085; *Westchester Secondary Charter School v. Los Angeles Unified School Dist.* (2015) 237 Cal.App.4th 1226, 1236).

## I.  Likelihood of Success on the Merits

In this appeal, Zhengfu asserts that it is likely to prevail on its claims against SMC Specialty for declaratory relief, interference with its contractual rights, conversion, and unfair business practices. All of these claims rest on the premise that Zhengfu's act of granting a security interest in the *Greyhound* Agreement to SMC Specialty was a nullity. Zhengfu offers two reasons why, in its view, it is likely to establish the truth of this premise (and hence the validity of its claims resting on this premise).[5] First, Zhengfu asserts that paragraph E.6 of the

---

[5]  Before the trial court, Zhengfu offered a third reason—namely, that Zhang had effectively "confessed" to engaging in subterfuge by pretending to have authority to act on Zhengfu's behalf while executing the various agreements granting SMC Specialty a security interest in Zhengfu's rights under the *Greyhound* Agreement. The trial court rejected this argument, finding that the sole evidence proffered in support of Zhang's "confession" was the statement of someone else relaying what

8

*Greyhound* Agreement prohibits Zhengfu from assigning its rights under the agreement to third parties as secured collateral, and that Commercial Code section 9408[6]—which sometimes overrides "anti-assignment" clauses like the one Zhengfu says is in the *Greyhound* Agreement—would still not permit SMC Specialty to take any action to *enforce* its security interest (such as foreclosing on the security interest and taking title to it). Second, Zhengfu asserts that the *Greyhound* Agreement is a "personal services" contract, which means it may not be assigned to anyone else, including SMC Specialty.

### A. *Does the* Greyhound *Agreement prevent Zhengfu from giving SMC Specialty a security interest?*

The premise of Zhengfu's first argument is that the language in paragraph E.6 of the *Greyhound* Agreement prohibited Zhengfu from using its rights under that agreement as collateral for Golden Title's loan, which thus triggers the provisions of section 9408. Paragraph E.6 provides as follows:

> "After receipt by [Sony] of all funding due from
> Zhengfu for the [*Greyhound*] Picture, Zhengfu shall

---

Zhang had confessed to, and was therefore inadmissible hearsay. (Zhengfu also offered a translated statement by Zhang himself purporting to admit to his subterfuge, but that statement was buried in an attachment to an attachment to an attachment, and was in any event unsworn and hence of no evidentiary value (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 184 ["unsworn declarations are of little to no evidentiary value"]). Zhengfu does not renew this argument on appeal, except to emphasize Zhang's alleged confession while concealing from this court the exclusion of that evidence by the trial court.

[6] All further statutory references are to the Commercial Code unless otherwise indicated.

be entitled to assign or transfer all or a portion of its rights hereunder if Zhengfu complies with the following requirements: (i) prior to negotiating for or making such assignment or transfer, Zhengfu will first negotiate in good faith with [Sony] for not less than thirty (30) days with respect to the potential assignment or transfer to [Sony] of such rights; and (ii) following such first negotiation period with [Sony], if no agreement has been reached between Zhengfu and [Sony], Zhengfu may negotiate with and agree to assign or transfer Zhengfu's rights hereunder to a third-party, provided: (A) such assignee or transferee is not a "Competitor" or "Industry Related Party" (as each is customarily defined by [Sony]); (B) such assignee or transferee certifies to [Sony] that each of the representations and warranties made by Zhengfu in the definitive agreement are true and correct with respect to such assignee or transferee, as if made to [Sony] directly by such transferee or assignee as of the date of such assignment or transfer; and (C) such assignee or transferee provides to [Sony] such additional documents or information regarding such assignee or transferee as may be reasonably requested by [Sony] to confirm the certification in subclause (B). <u>Any attempted or purported transfer, delegation or assignment by Zhengfu of any of its rights, duties or obligations hereunder or in the Picture in violation of the provisions hereof shall be void ab initio and of no force or effect and shall constitute a material breach</u>

<u>of, and an event of default under, the definitive</u> <u>agreement.</u> *Notwithstanding the foregoing, this* *provision shall not prohibit the foreclosure by any* *party having a lien on any of Zhengfu's rights* *hereunder permitted by this Term Sheet in accordance* *with any applicable intercreditor agreement.*"

(Italics and underlining added.)

In determining whether this language prohibits Zhengfu from granting SMC Specialty a security interest in its rights under the *Greyhound* Agreement, we must interpret this contractual provision. This is a task we undertake de novo. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.)

Independently examining this contractual language, we conclude that it does not prohibit Zhengfu from granting SMC Specialty a foreclose-able security interest in Zhengfu's rights under the *Greyhound* Agreement. As we read it, the first portion of the provision (that is, the portion without underlining or italics) sets forth a *general rule* that prohibits Zhengfu from voluntarily transferring its rights and duties under the *Greyhound* Agreement without (1) first giving Sony what amounts to a "right of first negotiation" either to buy out Zhengfu's interest or, if the negotiations fail, (2) requiring that the third party who seeks to purchase Zhengfu's interest meet certain requirements specified by Sony. The underlined portion sets forth the *consequences* of "violat[ing] the provisions hereof" (that is, of violating the general rule)—namely, that the assignment is "void ab initio" and constitutes a "material breach." And the italicized portion creates an *exception* to the general rule—namely, that "this provision shall not prohibit" a

11

"foreclosure by any party having a lien on any of Zhengfu's rights hereunder permitted by this Term Sheet in accordance with any applicable intercreditor agreement." This reading is dictated by the provision's plain text, and that text is controlling. (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1074-1075.)

When read in this manner, paragraph E.6's general rule restricts Zhengfu's ability to make a voluntary, noncontingent assignment of its interests in the *Greyhound* Agreement unless Zhengfu first negotiates with Sony and, failing that, Zhengfu's preferred assignee meets Sony's special requirements. This restriction does not reach so far as to restrict Zhengfu's ability to offer up its interest in the *Greyhound* Agreement as security for a loan. That is because the provision's negotiation and special requirement mandates make sense if Zhengfu is trying to step away from all or part of its duties under the *Greyhound* Agreement and have someone else take its place on a going-forward basis. They make little to no sense if Zhengfu is merely trying to use its interest in the *Greyhound* Agreement as collateral for another loan because Zhengfu will continue working alongside Sony unless and until there is a default on that other loan. We decline to construe the provision in a way that leads to results inconsistent with the objective manifestation of the parties' intent. (*Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1587 ["[m]utual assent to contract is based upon objective and outward manifestations of the parties"]; *SDC/Pullman Partners v. Tolo* (1997) 60 Cal.App.4th 37, 46 ["literal language of a contract does not control . . . if it is wholly inconsistent with the main intention of the parties"]; see generally Civ. Code, § 1653.)

12

Zhengfu resists this conclusion with what boils down to two arguments.[7]

First, Zhengfu argues that the last, italicized phrase must be read to limit Zhengfu's power to collateralize its interest to situations where there is an "applicable intercreditor agreement," which exists only when two or more creditors have entered into an agreement regarding the priority of any lien they may simultaneously have in Zhengfu's interest. (E.g., *Sedgwick FundingCo, LLC v. Newdelman* (Bankr. E.D.Cal. Jan. 20, 2022, No. 15-29890-A-7) 2022 Bankr. Lexis 150, *61-*62.) We reject this argument. To begin, this last phrase—by stating that it applies "[n]otwithstanding the foregoing"—operates as an *exception* to paragraph E.6's general rule. Because, as we have concluded, that general rule does not apply here, the exception also does not apply. This is also why we reject Zhengfu's

_____

[7] Before the trial court, Zhengfu seemed to suggest a third argument—namely, that Sony itself read paragraph E.6 as barring Zhengfu's creation of a security interest. The opinion of Sony regarding the meaning of paragraph E.6 is inadmissible because it is nothing more than a legal opinion. (*Pond v. Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 289 [lay opinion inadmissible]; *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100 (*Cooper*) [expert opinion on meaning of contract inadmissible]; *Gilkyson v. Disney Enterprises, Inc.* (2021) 66 Cal.App.5th 900, 921 (*Gilkyson*) [same].) And to the extent the opinion of Sony is offered as to what Sony subjectively intended paragraph E.6 to mean, it is also irrelevant because contracts are adjudged by their objective meaning rather than by unspoken, subjective intentions of the parties. (*Founding Members of the Newport Beach County Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.) Zhengfu does not press this argument on appeal.

suggestion that the language somehow creates a *second, general rule* barring all security interests.  Had Sony and Zhengfu wanted to bar the creation or enforcement of all security interests, they could have done so directly by saying, "No security interests are allowed."  They did not do so, and we decline to walk the circuitous and tortured path necessary to read the last, italicized clause as having that effect.  (See, e.g., *Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 820 [courts are not to "engage in strained or tortured interpretation[s] of the terms of a[] . . . contract"].)

Second, Zhengfu argues that SMC Specialty's conduct in this case violates section 9408, subdivision (d).  We need not determine whether there was any violation because section 9408 is irrelevant to this case.  Although the Commercial Code in California generally allows parties to decide whether their contractual interests may be assigned to third parties as security (§ 9201, subd. (a)), section 9408, subdivision (a) limits their power to prohibit future assignments:  Specifically and in pertinent part, that section deems "ineffective" as a matter of statutory law any "term" "that relates to . . . a general intangible," if that term (1) "would impair the creation, attachment, or perfection of a security interest," or (2) "provides that the assignment or transfer or the creation, attachment, or perfection of the security interest may give rise to a default [or] breach."  (§ 9408, subd. (a).)  In this fashion, section 9408 resurrects a right to assign or transfer security interests that the parties, by contract, have sought to put to death.  But the life that section 9408 breathes back into the power to create, perfect, and transfer security interests is a limited one, and its limits are spelled out in subdivision (d) of section 9408.  (§ 9408, subd. (d).)  The limits set forth in

14

subdivision (d) are irrelevant in this case because they only pertain to a right to transfer if it has been resurrected by subdivision (a) of section 9408. Because, as we have noted above, paragraph E.6 does not prohibit the type of assignment at issue in this case, there was no need for section 9408 to override that prohibition; thus, the conditions set forth in subdivision (d) that attach to revenant anti-assignment clauses are never implicated, so whether SMC Specialty did or did not exceed them is irrelevant.

**B.     *Are Zhengfu's cofinancing and distributorship duties under the* Greyhound *Agreement "personal services" that may not be assigned?***

Zhengfu's second argument rests on the premise that its responsibility to cofinance *Greyhound* and to distribute it in mainland China constitute "personal services" that may not be assigned, such that Zhengfu's duties under the *Greyhound* Agreement may not be assigned to SMC Specialty as security for the *Destroyer* bridge loan. It has long been the law in California that "a contract [that] calls for the skill, credit or other personal quality of the promisor . . . is not assignable." (*Knipe v. Barkdull* (1963) 222 Cal.App.2d 547, 551 (*Knipe*); *Manela v. Stone* (2021) 66 Cal.App.5th 90, 107.)

We conclude that the prohibition against assignment of personal services is not violated by SMC's act of foreclosing upon, and taking title to, Zhengfu's rights under the *Greyhound* Agreement. That is because Zhengfu's duties under that agreement to cofinance *Greyhound* and distribute it do not constitute personal services.

To the extent that Zhengfu is arguing that its duties are personal services because they may not be assigned, we reject

15

this argument because it rests on the premise that the *Greyhound* Agreement prohibits Zhengfu from assigning its rights under the agreement as collateral. (See *Unite Here Local 30 v. Department of Parks & Recreation* (2011) 194 Cal.App.4th 1200, 1213-1214 [assignability undercuts claim that duties are personal services].) As we have ruled, that premise is incorrect.

To the extent that Zhengfu is arguing that its duties under the *Greyhound* Agreement are personal services because they otherwise fit within the definition of "personal services," we reject this argument on its merits.[8] As noted above, personal services are those that rest on the "skill, credit or other personal quality of the promisor." (*Knipe*, *supra*, 222 Cal.App.2d at p. 551.) Thus, for example, contracts for a person to perform as a singer qualify. (E.g., *Beverly Glen Music, Inc. v. Warner Communications, Inc.* (1986) 178 Cal.App.3d 1142, 1143-1145.) Zhengfu's duties as cofinancer and distributor are not based on its "skill, credit or other personal quality" of a similar ilk. Cofinancing consists of providing funding; while financiers may not be wholly fungible, a bank or other company's act of providing money is not akin to a special talent or skill. While distributing a film might in certain cases constitute something that turns on a particular distributor's skill, that is not the case here because the *Greyhound* Agreement gives Sony complete control over how *Greyhound* is to be marketed, leaving Zhengfu little to do other

8        What is more, the opinion of Zhengfu's expert witness— that is, that a production company's process in selecting a distributor indicates that the distributor is performing personal services—amounts to nothing more than an inadmissible legal opinion that has no impact on our conclusion. (*Cooper, supra,* 31 Cal.App.4th at p. 1100; *Gilkyson, supra,* 66 Cal.App.5th at p. 921.)

than obtain permission from the Chinese government to distribute the film and then follow Sony's instructions on how to effect that distribution. (Accord, *Husain v. McDonald's Corp.* (2012) 205 Cal.App.4th 860, 868-870 [franchisee's duties are not personal services when the franchisor heavily regulates how those duties are to be performed]; cf. *Woolley v. Embassy Suites, Inc.* (1991) 227 Cal.App.3d 1520, 1534 [daily discretionary duties called for by management agreement constitute personal services].) Indeed, the very fact that the *Greyhound* Agreement gives Zhengfu the power to assign its duties to someone else as long as they meet Sony's special requirements indicates that Zhengfu's role under the agreement is not somehow something *only* Zhengfu may do. What is more, even if we were to agree with Zhengfu that Zhengfu's conduct in cofinancing and distributing *Greyhound* did involve its personal services, SMC Specialty has not sought to take over those functions from Zhengfu; all SMC Specialty has done is seek to collect the revenues to which Zhengfu is entitled. Thus, SMC Specialty's conduct has not effected an assignment of any personal services under the *Greyhound* Agreement.

## II.    **Balancing the Interim Harms**

Even if we were to ignore our conclusion that Zhengfu has not carried its burden of proving a likelihood of success on the merits of its claims, the trial court's denial of the preliminary injunction was appropriate because the court also did not abuse its discretion in finding that the balancing of interim harms counsels against its issuance. This balancing required the trial court to examine (1) the harm to Zhengfu if the preliminary injunction is denied against (2) the harm to SMC Specialty if the

17

preliminary injunction is granted. (*Integrated Systems*, *supra*, 6 Cal.App.5th at p. 1183.)

The harm to Zhengfu if the preliminary injunction is denied is relatively minor because Zhengfu did not establish how issuance of that injunction would improve its position. Even if we assume that the *Greyhound* Agreement barred SMC Specialty's acquisition of a security interest in Zhengfu's rights under the *Greyhound* Agreement, and that section 9408 nevertheless resurrected SMC Specialty's right to acquire that interest subject to the limitations of subdivision (d) of section 9408, subdivision (d) would prohibit SMC Specialty from *enforcing* the security interest and from demanding that Sony pay it Zhengfu's share of the revenues. (§ 9408, subd. (d)(1), (2), (3), (6).) Critically, however, section 9408 would still allow SMC Specialty to maintain its perfected security interest in Zhengfu's interest in the *Greyhound* Agreement. Zhengfu maintains that it is being harmed by Sony's refusal to proceed with distributing *Greyhound* in mainland China due to the dispute over SMC Specialty's potential ownership of Zhengfu's rights under the agreement, but Zhengfu has presented no evidence that the shift in SMC Specialty's status from *title holder* of Zhengfu's rights to *secured creditor* against those rights would resolve the dispute in Sony's mind and hence remove the roadblock Sony has imposed on distributing the film. Absent such evidence, there is no reason to believe that granting the injunction would have any benefit to Zhengfu and, conversely, that its denial would do Zhengfu any harm.

Concomitantly, the harm to SMC Specialty if the preliminary injunction is granted is great. If, as we are assuming, the injunction would downgrade SMC Specialty from

being title holder of Zhengfu's rights under the *Greyhound* Agreement to being a secured creditor under section 9408, subdivision (d), then SMC Specialty would either be in the same position (if Sony maintained its roadblock on distribution) or in a much worse position (if Sony removed the roadblock and allowed Zhengfu to collect revenues, which Zhengfu would then be free to withdraw and thereby remove from SMC Specialty's reach).

Where, as here, the potential harm from denying the injunction is minor and the potential harm from granting it major, the trial court did not abuse its discretion in denying relief.

\* \* \*

In light of our analysis, we have no occasion to address the parties' other arguments regarding the difficulty of calculating damages should Sony maintain its roadblock on distribution (because such difficulty does not affect our analysis that Zhengfu's claims are unlikely to succeed on the merits); regarding which point in time constitutes the "status quo" (because this inquiry at most determines whether the injunction is considered mandatory or prohibitory, which at best would require us to apply even *greater* scrutiny to the decision whether to issue the injunction); regarding whether the foreclosure sale was defective (because we have assumed for purposes of balancing the interim harms that the foreclosure would be unwound and because Zhengfu did not make any cogent arguments along these lines on appeal); and regarding whether the trial court was correct to draw a distinction between assignments of a contract and assignments of the proceeds of a contract (because what we evaluate is the trial court's ruling and not its rationale).

19

## DISPOSITION

The order is affirmed.  SMC Specialty is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:



_____, P. J.
LUI



_____, J.
CHAVEZ